Roger MILLS, 429–82–5169, Plaintiff,

v.

Louis SULLIVAN, M.D., Secretary of
Health and Human Services,
Defendant.

No. 91 C 6635.

United States District Court,
N.D. Illinois, E.D.

Aug. 31, 1992.

Henry Rose, Loyola University Law Center, Chicago, Ill., for plaintiff.

Marsha McClellan, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Roger Mills ("Mills") seeks judicial review of a final decision of Secretary of Health and Human Services Louis Sullivan ("Secretary") denying Mills' claim for disability insurance benefits under the Social Security Act ("Act") §§ 216(i) and 223, 42 U.S.C. §§ 416(i) and 423.[1] As is usual in these cases, both sides now move for summary judgment under Fed.R.Civ.P. ("Rule") 56.[2] For the reasons stated in this memorandum opinion and order, both motions are denied and this action is remanded to Secretary for further proceedings.

### Facts

Mills was born on April 2, 1938 and left school after completing part of the eleventh grade (R. 31, 114). He is married and lives with his wife in the second floor apartment of a building that he owns (R. 31, 64).

Between February 1968 and January 1987 Mills was employed by Bell and Howell Company. There he began as a stockroom boy, was later promoted to dispatcher and ultimately moved to the mailroom, where he later became a supervisor in charge of seven people (R. 32–34).[3] In that last position Mills ran the copy center as well as the mailroom, and he also worked in stationery supplies, record storage and security.

Thus Mills' job involved much active physical labor despite his supervisory status. It required "constant" standing, walking and lifting of various items weighing an average of 55 to 60 pounds and a maximum of 90 pounds (R. 33–34, 78, 95–98).

Mills stopped working after undergoing quadruple coronary artery by-pass surgery in January 1987 (R. 34, 196). He has not been employed since that time.

Mills' Testimony

Although his surgery was initially successful, Mills' symptoms began to recur about eight months later (R. 40, 90–91). Two to three times a day he experiences chest pain that lasts for two or three minutes until it subsides when Mills takes nitroglycerin. Mills is usually free of such pain for no more than two days. He also experiences pressure in his chest and shortness of breath when he moves around, and he suffers from tingling in his fingers and from numbness and pain in his arms (R. 40–43).

Mills also described numerous musculoskeletal ailments:[4]

1. To begin with, he has disk problems and pinched nerves in his back, which cause pain in his back, chest, shoulders, arms and fingers. Mills described the pain as "a tearing, twisting, pulling pain" that is constant and would rate at "8, 9, plus" on a scale of 1 to 10 (R. 44, 46–47, 50). Although he has tried numerous treatments, none have helped relieve that pain (R. 48).

1. All further statutory references will take the form "Section —," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. § —."

2. What follows in the "Facts" section of this opinion, drawn as it is from the administrative record ultimately brought to Secretary for decision, is not in dispute. Hence this case does not pose the usual cross-summary-judgment-motion challenge of drawing "those inferences that are reasonable" in the light most favorable to each nonmovant (see *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991)). All citations to the Administrative Record (the sole point of reference needed to decide the issues) will take the form "R. —."

3. That description of Mills' work history is derived from his hearing testimony. Another So-

cial Security Administration form (a "Report of Contact" handwritten by a Vocational Specialist on May 10, 1990, R. 132) provides a slightly different description, stating that Mills' positions were consecutively "shipping and receiving clerk," "office supplies clerk" and "mailroom supervisor." That form does include the same description of Mills' varied duties under the title of "mailroom supervisor" as is discussed in the text.

4. Mills' testimony as to the onset of the various pain symptoms described here was somewhat unclear (R. 70–71, 73–75, 92–94). After clarification by the Administrative Law Judge ("ALJ") and Mills' attorneys, Mills amended the alleged onset date of his disability, changing it from January 15, 1987 to January 31, 1990 (R. 70–71).

2. Mills also suffers from arthritis "in every joint in [his] body" (R. 49) and fibrositis. He experiences continuous pain in his shoulders, elbows, knuckles, fingers, knees and ankles that feels "like [his] joints want to explode" (R. 51–52). Mills also described that pain as being in the 8 to 9 range and said that it cannot be relieved no matter what position he assumes (R. 51–52).

3. Finally, Mills believes that he may have a torn rotator cuff in his left shoulder, which causes an occasional loss of motor control in his left arm (R. 53–54, 56, 79, 87).

In addition to those problems, Mills has been blind in his left eye since birth and has deteriorating vision in his right eye (R. 54–55, 105–06).

As for his functional limitations, Mills testified that he can bend but cannot squat or stoop, and that he can reach, but doing so causes pain in his shoulders (R. 55–56, 106). Mills can lift 5 to 10 pounds, but he could not do so repeatedly over an extended period of time (R. 59). Although Mills walks 1½ blocks three to five times a day for cardiovascular exercise, doing so causes pain in his ankle and in his shoulders if he swings his arms (R. 55). He also cannot stand comfortably (id.). Mills does drive, but that causes soreness in his shoulders and pain when he turns to look in either direction (R. 60).

Mills has difficulty moving in the morning, and he rises from bed slowly (R. 67). He then dresses himself, which takes about 30 to 45 minutes because of his sore shoulders and back (R. 67). Mills showers and shaves only when his wife is available to help him (R. 68). He typically goes for breakfast each day to a restaurant that is three blocks from his home (R. 68). He descends the 17 steps from his apartment to the ground floor with difficulty because of his morning stiffness, and upon returning he has to ascend "one step at a time" (R. 68, 107). After coming home he watches television or reads the newspaper, but he can sit in a chair comfortably for only 10 to 20 minutes, and his arm gets numb from holding the newspaper (R. 68–69). Mills sometimes naps during the day but is awakened by pain after 10 to 15 minutes (R. 103).

Mills' health problems have caused him to give up his former hobbies of bowling, hunting and fishing (R. 61–62). He has also stopped doing repair and maintenance work around the apartment building (R. 64), and his wife does all the yard work and household chores (R. 67, 99). Mills is unable to sleep for more than 3 to 4 hours a night because of his pain, and he is uncomfortable no matter what position he assumes (R. 47, 51, 67, 102). He also has problems concentrating (R. 56–59, 81–83), and he sometimes experiences depression because of his chronic pain (R. 69, 72, 80–81).

Medical Evidence

On January 31, 1990 Mills was hospitalized at St. Elizabeth's Hospital after complaining of pain and pressure in his chest, pain in his left arm and paresthesia on his left ring finger (R. 151–52). Mills' chest x-ray showed borderline cardiac enlargement but was otherwise normal (R. 155), and his myocardial scan showed a "mild" decrease in the ejection fraction to 55% and was also otherwise normal (R. 156). Mills' stress thallium cardiac scan was "essentially normal" (R. 158), but his EKG was initially abnormal. It revealed "sinus bradycardia[5] with 1st degree A–V block," left atrial enlargement and T–wave abnormality (R. 159–60, 205). X–rays of Mills' left shoulder and elbow revealed mild arthritic changes in the shoulder and post-traumatic osteoarthritis in the elbow that was related to an old injury there (R. 157). Mills' range of motion was within normal limits (R. 153). He was discharged on February 6, 1990 with a diagnosis of angina and arthritis of the left shoulder (R. 151).

Between February 6 and February 7, 1990 Mills was hospitalized at Saint Mary of Nazareth Hospital Center (R. 185),

5. "Bradycardia" refers to a slow heart rate, usually defined as under 60 beats per minute (*Stedman's Medical Dictionary* 191 (5th Unabridged L.Ed.1982 ["*Stedman's*"]). When the EKG was repeated, it revealed a normal sinus rhythm (R. 160).

where he underwent a cardiac catheterization. That procedure revealed a "mild hypokinesia [6] of the anterolateral wall," "severe coronary atherosclerosis [7]" and "posteromedial scalloping of the posterior leaflet of the mitral valve" (R. 189–90).

Dr. R. Dizon, who had been Mills' attending physician at St. Elizabeth's, completed a cardiac report on March 29, 1990 based on an examination three weeks earlier (R. 196–97). Dr. Dizon reported that Mills' diagnosis was angina pectoris, coronary artery disease, hypertension, blindness in his left eye and osteoarthritis. Dr. Dizon also reported that Mills' chest pain was "crushing," "burning," "squeezing" and "sharp," lasted for less than 15 minutes, was brought on by walking, emotional upset and eating, and was relieved by rest and nitroglycerin. Dr. Dizon concluded that Mills could not engage in gainful employment because of his angina and arthritis.

Dr. Dizon also completed an arthritic report (R. 198–99). He stated that Mills had osteoarthritis in the shoulder, elbow, knees, ankles and spine and had suffered from arthritis since 1980. Dr. Dizon did not identify any anatomical deformity or bone destruction, but he did note bone hypertrophy [8] in Mills' spine. Dr. Dizon reported that Mills had pain and stiffness, slight manipulative limitations and loss of motion in his ankle, shoulder and elbow, but that he walked normally and did not require a cane.

Dr. John P. Monteverde, a cardiologist who had performed Mills' catheterization, examined Mills and completed a cardiac report on April 11, 1990 (R. 207–08). Dr. Monteverde stated that Mills' diagnosis was coronary atherosclerosis and that Mills had substernal chest pain that occurred daily, lasted for less than 15 minutes, was precipitated by walking and was relieved by rest and nitroglycerin.

On April 26, 1990 Mills underwent an exercise stress test. He was able to exercise for 6½ minutes before he had to stop because of dizziness. Dr. Karen A. Leone (another cardiologist) concluded that the test was submaximal and inconclusive for ischemia [9] and that Mills had achieved 70% of his maximum target heart rate (R. 213).

On June 26, 1990 Dr. Robert S. Katz (a rheumatologist) wrote a letter in support of Mills' DIB application (R. 216). He stated:

> Mr. Roger Mills has fibromyalgia. He experiences diffuse pain, including his back, shoulders, arms, ankles, and knees. This pain has been quite severe. He sleeps poorly, his energy is low. Because of his pain and poor energy, he is unable to work effectively and is therefore applying for disability.
>
> *    *    *    *    *    *
>
> Fibromyalgia can cause quite severe symptoms, especially pain and fatigue, and it may be incapacitating despite the lack of objective findings on exam.

Dr. Katz reported that Mills' joint examination was normal but that "he is tender over multiple muscles, including trapezius muscles, neck, thoracic spine, lumbosacral spine, and chest wall." Dr. Katz also observed that Mills had tried numerous medications but that none had relieved his pain, and that Mills had been unable to work for the past eight months because of his pain and fatigue.

On July 13, 1990 Mills had a CT scan of his cervical spine and left shoulder (R. 217–18). That scan revealed:

> Moderately advanced degenerative changes are noted at the C3–4 level. The disc space is narrowed and there is encroachment on the corresponding right and left neural foramina.[10] There is slight narrowing of the C5–6 interverte-

---

**6.** [Footnote by this Court] "Hypokinesia" is slowed movement (*Stedman's* at 681).

**7.** [Footnote by this Court] "Atherosclerosis" is a form of arteriosclerosis—hardening of the arteries (*Stedman's* at 120, 136).

**8.** "Hypertrophy" refers to an increase in bulk (*Stedman's* at 677).

**9.** "Ischemia" is "local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply" (*Stedman's* at 728).

**10.** [Footnote by this Court] "Foramina" is the plural of foramen—"an aperture or perforation through a bone ..." (*Stedman's* at 548).

bral disc and encroachment on the C5–6 left neural foramen.

Dr. J.P. Petasnick (a radiologist) included the following impressions on the CT scan report:

1. Degenerative changes are present in the cervical spine involving the C3–4 and C5–6 level as described above.

2. Changes are present in the left shoulder hightly [sic] suggestive of a rotator cuff tear.

3. C4–5: Mild right neural foraminal stenosis [11] secondary to end plate osteophytes [12] and right facet hypertrophy.

4. C5–6: Bilateral neural foraminal stenosis. Mild spinal stenosis secondary to diffuse disc bulging.

5. C6–7: Left posterolateral disc herniation results in mild spinal stenosis. No foraminal stenosis.

On August 28, 1990 another CT scan of the cervical spine yielded similar results (R. 219).

Mills also underwent an electromyography ("EMG") exam on July 13, 1990. That test resulted in the following impressions (R. 221–22):

1. Electrophysiologic studies performed today revealed evidence of denervation [13] of cervical paraspinal muscles at the left C5–C6 and C7–T1 levels consistent with radiculopathy [14] at those levels. There is also evidence of a denervation at the C6–C7 level, but this appears to be more chronic. There was no evidence of denervation in the myotomally equivalent muscles of the left upper extremity.

2. There is no electrophysiologic evidence of a peripheral neuropathy affecting the left upper extremity.

Based on the then existing medical evidence, consultative physician R.T. Patey

completed a "residual physical functional capacity assessment" on May 7, 1990 (R. 229–36). Dr. Patey concluded that Mills could lift or carry up to 50 pounds occasionally and up to 25 pounds frequently,[15] although he did say that Mills' "arthralgia would preclude heavy lifting." Dr. Patey also opined that Mills could stand or walk for about 6 hours during an 8–hour day, could sit for less than 6 hours and had an unlimited capacity to push and pull with his hands or feet. Dr. Patey concluded that Mills' abilities to climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger and feel were all unaffected—except that Mills could not reach above his head with his left arm—and that Mills had no visual, communicative or environmental limitations.

On August 10, 1990 Dr. Patey completed another assessment (taking into account the other medical evidence that had been generated in the interim) and reached identical conclusions (except that this time he did not note Mills' inability to reach above his head) (R. 237–244). In that later report Dr. Patey also stated that "[t]here does not appear to be definite evidence to show that [Mills] cannot do medium work" (R. 242).

On January 5, 1991 Dr. Katz completed a medical questionnaire and physical capacities evaluation (R. 259–60).[16] Dr. Katz wrote that he had been treating Mills since May 7, 1990 and that Mills' diagnosis included cervical radiculopathy, fibromyalgia, osteoarthritis of the neck, chest wall pain and shortness of breath. He stated that Mills' ability to work on a full time basis was limited by "just the pain, which is constant and intense." According to Dr. Katz, Mills could sit, stand or walk for 2 hours at a time and for 4 hours cumulative-

11. [Footnote by the Court] "Stenosis" is "[a] stricture of any canal" (*Stedman's* at 1336).

12. [Footnote by this Court] "Osteophyte" is "a bony outgrowth" (*Stedman's* at 1004).

13. [Footnote by this Court] "Denervation" is a cutoff of the nerve supply (*Stedman's* at 374).

14. [Footnote by this Court] "Radiculopathy" is a disease of the spinal nerve roots (*Stedman's* at 1187).

15. "Frequently" means between ⅓ and ⅔ of an 8–hour day and "occasionally" means from very little to ⅓ of an 8–hour day (R. 229).

16. That report was not added to the record until after the ALJ had written her decision described later in this opinion, but it was included before Secretary's Appeals Council denied Mills' request for review of that decision.

ly during an 8–hour day, could lift up to 5 pounds continuously, could carry that weight frequently and could lift or carry up to 20 pounds occasionally. Dr. Katz opined that Mills could never lift or carry more than 20 pounds. Dr. Katz also said that Mills could bend frequently, could squat, climb and reach occasionally and could not crawl at all. Finally, he reported that Mills' capacity for simple grasping, fine manipulation and pushing and pulling with his arms and legs was unaffected.

### Statutory and Regulatory Framework

Section 423(d)(1)(A) defines disability as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...

*Young v. Secretary of HHS*, 957 F.2d 386, 389 (7th Cir.1992) (case citations omitted) explains the process that guides Secretary's evaluation of a disability claim:

When considering whether a claimant is eligible for benefits, the Secretary uses a five-step inquiry: 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at

steps three or five results in a finding of disability. 20 C.F.R. § 404.1520 (1991).

If the assessment of an individual reaches step 5, the rules in the Medical Vocational Guidelines of Reg. Part 404, Subpart P, Appendix 2 (the "Grid") come into play. Those Grid rules reflect an analysis of the vocational factors of age, education and work experience (Reg. §§ 404.1563–.1565) in combination with the claimant's residual functional capacity ("RFC"). RFC is defined by Secretary as (*Marcus v. Sullivan*, 926 F.2d 604, 608 (7th Cir.1991), quoting SSR 83–10):

[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).

RFC is expressed in terms of a claimant's maximum sustained work capability for either "sedentary," "light," "medium," "heavy" or "very heavy" work as those terms are defined in Reg. § 404.1567. Where an ALJ's findings of fact as to the vocational factors and RFC coincide with all the criteria of a particular Grid rule, the rule directs a conclusion of "disabled" or "not disabled."

### Procedural History and Administrative Findings

Mills applied for disability insurance benefits in February 1990,[17] claiming that he had been disabled since January 15, 1987 (R. 114–16). His application was denied both initially and upon reconsideration, after a determination in each instance that Mills could return to his past occupation (R. 117–18, 122–24).

Mills requested and received a de novo hearing, which was held before ALJ Mimi Hwang Leahy on January 11, 1991. ALJ Leahy denied Mills' application on April 24, 1991, finding (R. 22):

1. The claimant met the disability insured status requirements of the Act on January 31, 1990, the date the claimant

---

**17.** Although Mills' dated his application 1989, that notation was apparently an error. Both sides and the ALJ have referred to 1990 as the year of Mills' application, and the application itself also reflects that it was processed in 1990.

stated he became unable to work, and continues to meet them through December 31, 1992.

2. The claimant has not engaged in substantial gainful activity since January 31, 1990.

3. The medical evidence establishes that the claimant has severe arthritis, chest pain, a diagnosis of fibromyalgia, and is status post coronary bypass, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's complaints are not supported by the objective medical evidence and are not credible.

5. The claimant has the residual functional capacity to perform work related activities except for work involving lifting over 25 pounds frequently and 50 pounds occasionally and work requiring binocular vision (20 CFR 404.1545)

6. As generally performed in the national economy, the claimant's past relevant work as mailroom supervisor did not require the performance of work related activities precluded by the above limitation(s) (20 CFR 404.1565).

7. The claimant's impairments do not prevent the claimant from performing his past relevant work.

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(e)).

To restate the ALJ's findings in terms of Secretary's five-step inquiry, ALJ Leahy found that (1) Mills is not gainfully employed and (2) has a severe impairment but (3) that impairment does not meet one of the listings. ALJ Leahy's disqualifying decision came at the fourth step of the process, when she determined that Mills' impairments did not prevent him from returning to his past work as a mailroom supervisor.

Following the ALJ's decision, Mills requested review by the Appeals Council. In addition to the evidence considered by the ALJ, the Appeals Council received Dr. Katz' January 5, 1991 reports and a list of Mills' medications dated January 11, 1991 (R. 5). On September 27, 1991 the Appeals Council denied Mills' request for review. ALJ Leahy's decision thus became Secretary's final decision.

*Standard of Review*

Section 405(g) empowers this Court to affirm, modify or reverse Secretary's decision, with or without remand for rehearing. Section 405(g) also provides, however, that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." As taught by many cases, including *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir.1987) (citation omitted):

> [A]fter review we must accept the findings of the ALJ if supported by substantial evidence. In so doing, we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the ALJ.

"Substantial evidence" means (*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)):

> more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

"Substantial evidence may be something less than the greater weight or preponderance of the evidence" (*Young*, 957 F.2d at 389), and a finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion (*Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986) (per curiam)).

This Court is called upon to decide two separate "substantial evidence" questions:

1. whether the ALJ's determination that Mills could return to his past occupation was supported by such evidence, and

2. whether the Appeals Council's determination that Mills' additional evidence did not provide a basis for chang-

ing the ALJ's decision was also supported by such evidence.

This opinion now turns to both of those tasks.

### ALJ Leahy's Decision

Mills does not contest the ALJ's findings at the first three steps of the analysis, but he does object to ALJ Leahy's step 4 determination that he could return to his past occupation. *Prince v. Sullivan,* 933 F.2d 598, 602 (7th Cir.1991) teaches that an ALJ has the affirmative duty to make the findings specified in SSR 82–62 as required for a proper step 4 analysis:

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:
>
> 1. A finding of fact as to the individual's RFC.
>
> 2. A finding of fact as to the physical and mental demands of the past job/occupation.
>
> 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

■ Mills contests ALJ Leahy's findings at the first two stages of that process. Taking the two in reverse order, he argues that:

> 1. the ALJ's findings as to the exertional demands of Mills' past occupation are insufficient under Seventh Circuit law, and
>
> 2. the ALJ's determination that Mills' had the RFC to perform medium work is not supported by substantial evidence because it is contradicted by the opinions of Mills' treating physicians.

Of course the ALJ's determinations must be evaluated based only on the evidence that was before her at the time of her decision.

Mills' Former Occupation

■ *Steward v. Bowen,* 858 F.2d 1295, 1300 (7th Cir.1988) quotes from SSR 82–61

as to the alternative means of determining the exertional demands of a claimant's former occupation:

> 1. The actual functional demands and job duties of a particular past relevant job; or
>
> 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

Cases such as *Strittmatter v. Schweiker,* 729 F.2d 507, 509 (7th Cir.1984) and *Nolen v. Sullivan,* 939 F.2d 516, 518–19 (7th Cir. 1991) make it clear, however, that even if the ALJ chooses the latter of those two routes (as ALJ Leahy did here), a simple determination that the demands of the job are "medium," "light" or "sedentary" is insufficient. Instead, because not all jobs within each of those categories have identical physical requirements, the ALJ must look more specifically at the demands of the particular type of work that the claimant performed. As *Nolen, id.* at 518 explained:[18]

> In *Strittmatter v. Schweiker,* 729 F.2d 507 (7th Cir.1984), we held that an ALJ cannot describe a claimant's job in a generic way—there, "sedentary"—and conclude, on the basis of the claimant's residual capacity, that she can return to her previous work. Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks.

■ In this instance ALJ Leahy clearly failed to comply with those *Strittmatter* requirements. This was her entire discussion related to Mills' former occupation (R. 21):

> [Mills'] job as mailroom supervisor [was] determined by a State Agency vocational specialist to be of a medium exertional level....
>
> *      *      *      *      *      *

As noted above, the vocational specialist stated that the claimant's job as a mail-

---

18. *Nolen, id.* also quotes SSR 82–62:

Past work experience must be considered carefully to assure that the available facts

support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work.

**1056**

room supervisor was medium level work as generally performed in the national economy. The Administrative Law Judge accepts this expert opinion.[19]

But it will be recalled that Mills' job was physically demanding, calling for the frequent lifting of heavy objects (55 to 60 pounds on the average, and as much as 90 pounds), while the corresponding numbers for "medium" work (which is defined in Reg. § 404.1567(c)) are much smaller, conforming to ALJ Leahy's Finding 5: 25 pounds frequently and 50 pounds occasionally. And those heavy physical demands are not the only respect in which the job content of Mills' multifaceted former occupation differed from the limited and primarily sedentary activity suggested by the "mailroom supervisor" label alone. ALJ Leahy's conclusion that Mills can return to his former occupation was therefore flat-out wrong—it was based on a plainly erroneous finding as to the *actual* demands of that occupation and cannot stand.[20] Although that mistake alone is so basic as to require a remand, this opinion goes on to the other aspects of the analysis to minimize the prospect that other past errors may be repeated in those future proceedings.

### Mills' RFC

Mills' also contends that the ALJ's conclusion that Mills' could perform medium work is not supported by substantial evidence. As already indicated, Reg. § 404.-1567(c) defines medium work:

> Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.

Even though Mills concedes that Dr. Patey's evaluation supports the ALJ's finding that Mills could meet those requirements, he argues that such a finding is contradicted by the opinions of Drs. Dizon and Katz, which should have been given greater weight because they came from Mills' treating physicians.

It is true that such cases as *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir.1982) express a general preference for the opinion of treating physicians because they are usually more familiar with claimants' conditions than are nontreating physicians. That reasoning would certainly apply in this instance, as both Drs. Dizon and Katz have examined and have had ongoing relationships with Mills, while Dr. Patey never examined Mills and had to derive his opinion merely from a review of Mills' record. In addition, because Dr. Katz is a rheumatologist and no specialty is noted for Dr. Patey, one principal factor that sometimes leads courts to apply a different preference, favoring the opinion of consulting physicians—the fact that such consultants may bring greater expertise to bear on the case (see, e.g., *Stephens v. Heckler*, 766

---

**19.** [Footnote by this Court] In fact that "specialist" (whose "expert" qualifications are undisclosed by the record) had not made such a determination about Mills' specific job at all, but had simply recited what Mills used to do at work—including the heavy lifting requirements—then said in generic terms (R. 134):

> Based on limitations of R.F.C. dated 5–7–90, the claimant may perform previous job as a Mailroom Supervisor (clerical) 209.137–010, as commonly performed in the national economy.

**20.** *Relatedly Mills shows that the description of* the job of mailroom supervisor in the *Dictionary of Occupational Titles* ("DOT") (U.S. Dept. of Labor 1991), DOT Code No. 209.137–010, does not correspond to the job that Mills actually performed, even though the two share the same title. In that respect Mills points to the discussion in *Paige v. Bowen*, 695 F.Supp. 975, 980–81

(N.D.Ill.1988), where this Court held that such blind matching of job titles is insufficient and that if plaintiff's actual job entailed the duties of additional DOT job listings, those additional listings must also be considered in evaluating the exertional demands of such a "composite" job. Mills' argument is worth repeating because that the DOT description of "mailroom supervisor" (a *totally* clerical job, not at all physically demanding) clearly does not match Mills' real-world job duties, so that it would provide an inadequate basis for comparison on remand. That issue may or may not arise, of course—ALJ Leahy apparently did not rely on the DOT, which (as the Appeals Council later pointed out) describes the position of mailroom supervisor as requiring only light work. Indeed, ALJ Leahy's discussion is too cryptic to allow for *any* conclusions at all about just how she arrived at her decision that Mills' past job entailed medium work.

F.2d 284, 289 (7th Cir.1985))—would in this instance also favor Dr. Katz' opinion.

But Mills' argument still cannot prevail. At the time of the ALJ's decision neither Dr. Dizon nor Dr. Katz had expressed any opinion as to Mills' RFC. Mills disputes that, pointing to Dr. Dizon's statement that Mills "can't perform gainful job because of disability" (R. 197) and Dr. Katz' statement that "[b]ecause of the pain and poor energy, [Mills] is unable to work effectively and is therefore applying for disability" (R. 216). But neither of those statements, which express legal conclusions rather than medical opinions, provides any relevant information about Mills' RFC. As Reg. § 404.1527 (emphasis in original) explains:

> We are responsible for determining whether you are disabled. Therefore, a statement by your physician that you are *disabled* or *unable to work* does not mean that we will determine that you are disabled. We have to review the medical findings and other evidence that support a physician's statement that your are *disabled.*

Even more to the point, *Garrison v. Heckler,* 765 F.2d 710, 713 (7th Cir.1985) (citations omitted) states:

> The treating physician's further assertion that Garrison is disabled from any employment is not a medical statement at all. It is a proposition about how particular medical impairments produce reductions in physical exertion, and how such reductions in exertion affect the ability to work. The treating physician's views do not answer the question or tell the agency what tasks Garrison can and cannot perform.

█ Here as in *Garrison* the treating physicians have not provided any information that contradicts Dr. Patey's determination that Mills' could perform medium work. Dr. Patey's conclusion that Mills could lift up to 25 pounds frequently and up to 50 pounds occasionally, things consistent with the demands of medium work, was the only specific opinion in the record as to Mills' RFC at the time of the ALJ's decision. When a consulting physician's opinion is not contradicted by any record evidence, the ALJ does not err in relying on that opinion, notwithstanding the existence of some factors that might otherwise disfavor it (*Steward,* 858 F.2d at 1298–99). ALJ Leahy's finding that Mills could perform medium work was therefore supported by substantial evidence.

*Appeals Council's Denial of Review*

█ Secretary's regulations identify conditions under which review by the Appeals Council is appropriate (Reg. § 404.970). Among those reasons is the submission of "new and material evidence" (Reg. § 404.-970(b)):

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

As has recently been reconfirmed in *Scivally v. Sullivan,* 966 F.2d 1070, 1075 (7th Cir.1992), this Court is entitled to review an Appeals Council decision as to whether additional evidence is "new and material":

> When the Appeals Council denies review and concludes that the ALJ's decision is final, the court reviews the ALJ's determination as well as any new evidence which the Appeals Council may have found to be immaterial.

In such a review this Court applies the same standard that it would use in determining materiality under Section 405(g), which empowers the court to remand to the Secretary to consider new evidence that is material (*Nelson v. Bowen,* 855 F.2d 503, 506 (7th Cir.1988)). Under that standard, new evidence is material "if there is a 'reasonable possibility' that it would change the outcome" (*id.,* quoting *Godsey v. Bowen,* 832 F.2d 443, 444 (7th Cir.1987)).

■ In this instance, Dr. Katz' January 5, 1991 reports predated the ALJ's decision by four months. By definition, then, they did relate to Mills' condition before the date of that decision as required by Reg. § 404.-970(b).[21] However, the Appeals Council nonetheless denied review after it concluded that Dr. Katz' reports did not "provide[ ] a basis for changing the [ALJ's] decision" (R. 6). But its decision to discount Dr. Katz' reports rested on a patent misreading of what he had said and done (R. 5):

> The Appeals Council notes that Dr. Katz indicated you were restricted to a limited range of light work activity,[22] but his report contained no detailed rationale or medical findings to support his opinions.

That mischaracterization is really unexplainable.[23] As the medical evidence section of this opinion has said, Mills' July 13 CT scan and EMG exam (both of which had been ordered by Dr. Katz) disclosed several abnormalities: the CT scan revealed numerous spinal abnormalities and changes in Mills' left shoulder indicative of a torn rotator cuff, while the EMG revealed neurologi-

cal problems consistent with radiculopathy, which was included in Dr. Katz' January 5, 1991 diagnosis. Dr. Katz' January 5 opinion was, as he stated in the medical questionnaire (R. 259), based on those objective findings. Dr. Katz also provided a detailed diagnosis in support of his functional assessment (id.). Dr. Katz' assessment was therefore sufficiently supported to have merited consideration. It was clear error for the Appeals Council to have rejected it out of hand.

In addition, Dr. Katz' assessment was plainly material. As already discussed, Dr. Katz' status as both Mills' treating physician and a rheumatologist entitled his opinion to greater weight than that of Dr. Patey, who is not a specialist and did not examine Mills.[24] Hence Dr. Katz' opinion regarding Mills' limited functional capacity might well have overridden Dr. Patey's determination that Mills' could perform medium work. There is certainly a "reasonable possibility" that it would have led to a different outcome.[25]

21. Although Section 405(g) requires a showing of good cause for failure to incorporate the evidence into the record at a prior proceeding, that requirement does not apply to new evidence presented to the Appeals Council.

22. [Footnote by this Court] Reg. § 404.1567(b) defines light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Dr. Katz' assessment, which states that Mills can lift and carry only 5 pounds frequently and can sit for only 2 hours at a time, does not support a finding that Mills can perform the full range of light work. That apparently explains the Appeals Council reference to "a limited range of light work activity."

23. This Court has not of course forgotten that its role is one of determining whether Secretary's decision is supported by "substantial evi-

dence." But any statement that so unquestionably misreads a document cannot of course meet that standard, though it is somewhat awkward to speak of such a statement in terms of its being. with or without support in the "evidence."

24. This Court's just-published opinion in *Maxwell v. Sullivan*, 792 F.Supp. 582 (N.D.Ill.1992) treats with the tension between the two lines of authority emanating from our Court of Appeals as to which type of medical opinion ought to be given preferred consideration, either by an ALJ in the first instance or on review (id. at 589–90). But in this case the arrow clearly points to the doctor who was both the treating physician *and* a specialist, Dr. Katz.

25. Although the Appeals Council did not explicitly say as much, its conclusion that Dr. Katz' assessment would not have supported a different outcome may also have been based in part on its finding—in contrast to ALJ Leahy's determination—that according to DOT Code No. 209.-137–010 Mills' past occupation as a mailroom supervisor required only light work (R. 6). But this opinion has already held that any such simple categorization of the job's exertional demands does not satisfy the *Strittmatter* requirements for a proper step 4 analysis. And as the Appeals Council itself observed, Dr. Katz' assessment does not support a finding that Mills can perform the full range of light work activity in any event.

*Conclusion*

This case must be remanded to Secretary so that a proper step 4 determination can be made. Secretary must determine (1) the exertional requirements of Mills' former occupation, (2) Mills' RFC (taking into account Dr. Katz' assessment) and (3) whether Mills' RFC is sufficient to meet the demands of his former work. If that analysis yields a negative finding, Secretary must then conduct a step 5 analysis to determine if Mills is disabled.