**Anthony HADDON, Plaintiff,**

v.

**Donna SHALALA, Secretary of Health and Human Services, Defendant.**

No. 90 C 4931.

United States District Court, N.D. Illinois, E.D.

March 19, 1993.

Opinion and Order on Motion to Alter or Amend April 5, 1993.

Robert C. Kielian, M. Jacqueline Walther, Kielian & Walther, Chicago, IL, for plaintiff.

Jack Donatelli, Asst. U.S. Atty., Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Anthony Haddon ("Haddon") appeals the final decision of Secretary of Health and Human Services Donna Shalala ("Secretary")[1] denying his claim for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 1382–1382c.[2] As is usual in these cases, both Thomas and Secretary have filed motions for summary judgment under Rule 56. For the reasons stated in this memorandum opinion and order, this action is remanded to Secretary for the taking of additional evidence.

### Facts [3]

Haddon was born November 25, 1949. He supplemented his 10 years of formal education by acquiring a G.E.D. (R. 18, 19, 41). It is not entirely clear from the record whether he is married.[4]

In 1969 Haddon was honorably discharged for chronic motion sickness after two years' service in the Navy (R. 55–56). Between 1973 and 1975 Haddon worked full time as a security guard for a lounge, protecting patrons and patrolling the parking area (R. 20). That job ended when the lounge closed (R. 20). Haddon looked for work after that, but he testified that he gave up the search in 1979 (R. 21).

1. Louis Sullivan was Secretary when this action was brought. With the 1993 change in administration, he was succeeded by Donna Shalala. Fed.R.Civ.P. ("Rule") 25(d)(1) provides for her automatic substitution as a party, so this Court has made that change in both the case caption and the text of this opinion.

2. Further citations to the statute will simply take the form "Section —." Pertinent regulations, all of which are found in 20 C.F.R. § 404, will be cited as "Reg. § —."

3. All of the testimony referred to here was presented during Haddon's first hearing referred to later in this opinion—the one held on May 24, 1989 (the "Hearing").

4. Although Haddon checked the "Single" box on his SSI application form, in which the word "Single" was followed by the parenthetical "(never married)" (R. 41), notes from counseling sessions at the VA refer to Haddon's "wife" and describe his anxiety over "marital conflict" and "recent separation of spouse" (Supp.R. 46, 52). As to that last parenthetical citation, Haddon has obtained leave from this Court to submit a supplemental record, cited here as "Supp.R." Because Haddon provided no pagination, this Court has numbered the pages in the supplemental record, beginning with the first page after the signature page of Haddon's motion to supplement.

*Haddon's Testimony*

Haddon testified that he has continual stomach pain from bleeding ulcers, for which he has taken Maalox, Mylanta and Tagamet for 14 years (R. 22, 23).[5] Haddon has declined surgery to treat his ulcer, and he has also avoided having x-rays (R. 35, 33). On several occasions he has visited emergency rooms to obtain blood transfusions due to loss of blood from vomiting and dehydration (R. 29, 30, 32–34). Often he has no appetite, and he has lost weight—at the time of the Hearing he was five feet eleven inches tall and weighed 135 pounds (R. 21, 24).

Haddon also has back pain, which is sometimes linked to his stomach pain. That back pain causes him to have problems bending and lifting (R. 23, 29). Sometimes the pain in his stomach and back wakes him up (R. 37).

Haddon gets dizzy if he stands for more than a few hours (R. 22). Essentially he spends his days drawing and reading (R. 26).

Since 1968 Haddon had used illegal street drugs. For two years before the Hearing he had gone daily to a Veteran's Administration methadone treatment program (R. 25, 211), and at the time of the Hearing he had been off of heroin for a year (R. 22).

*Medical Evidence*

Since 1985 Haddon has been treated at several hospitals for stomach pains and vomiting blood. Haddon was hospitalized for four days beginning December 2, 1985 at Cook County Hospital, being diagnosed there with duodenitis (R. 229). On March 4, 1986 Haddon was transferred from St. Bernard's Hospital to the University of Illinois Hospital, showing symptoms of epigastric pain radiating to the back with nausea and vomiting of undigested food (R. 91, 153). There he was diagnosed with acute pancreatitis (R. 163). Rather than undergo an endoscopy and have a naso-gastrointestinal tube inserted, Haddon left the hospital on March 7 (R. 99, 149). On May 20, 1986 Haddon was admitted to Michael Reese Hospital with abdominal pain, vomiting and fever (R. 166). Physicians there were unsure of the etiology of his symptoms (R. 171). After again refusing a naso-gastrointestinal tube (R. 166, 177), Haddon was discharged on May 23 with a diagnosis of probable gastroenteritis, pancreatitis and opiate abuse (R. 166).

On October 17, 1987 Haddon was admitted to the detox unit at the West Side VA Hospital (R. 249). He was diagnosed with heroin dependence and accepted into the substance abuse program (R. 249).

After having treated Haddon in the emergency room at Englewood Hospital in April 1987, Dr. Brahm Gupta saw him on several occasions between April 7, 1987 and March 12, 1988 at Dr. Gupta's clinic (R. 29, 57–60, 75–79). Dr. Gupta reported[6] that Haddon had a duodenal ulcer and took his medicine only irregularly. However, Dr. Gupta opined that Haddon was fully capable of doing work, taking care of himself and his house, shopping, paying bills and other ordinary daily activities (R. 58). Dr. Gupta also judged Haddon capable of managing his own funds and of carrying out and understanding instructions (R. 60).

Dr. Kuangjyh Chen, an internist, examined Haddon on a consultative basis on January 19, 1988 (R. 71–73). Dr. Chen reported no significant physical or mental abnormalities. Haddon told Dr. Chen that he did his own shopping and cooking, that he got along with others satisfactorily, and that he liked to play the saxophone and draw. He also told Dr. Chen that he was in school (R. 72–73).

On August 29, 1988 Haddon went to the West Side VA clinic, complaining of stomach pain and inability to keep down food (R. 243–44). He was diagnosed with viral gastroenteritis and was told to drink plenty of fluids and eat bland foods (R. 244).

Statutory and Regulatory Framework

Section 1382c defines an individual as "disabled":

---

**5.** At one point during the Hearing Haddon testified that the only medication he was taking was Methadone (R. 24), but later he stated that he was taking Tagamet, Mylanta and Maalox (R. 37).

**6.** Dr. Gupta's psychiatric report, filled out at the behest of the Bureau of Disability Determination Services, was undated. However, it was part of the Hearing record before the administrative law judge ("ALJ").

if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....

*Young v. Secretary of HHS,* 957 F.2d 386, 389 (7th Cir.1992) (case citations omitted) explains the process that guides Secretary's evaluation of a disability claim:

When considering whether a claimant is eligible for benefits, the Secretary uses a five-step inquiry: 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability. 20 C.F.R. § 404.1520 (1991).

If the assessment of an individual reaches step five, the rules in the Medical Vocational Guidelines of Reg. Part 404, Subpart P, App. 2 (the "Grid") come into play. Those Grid rules reflect an analysis of the vocational factors of age, education and work experience (Reg. §§ 404.1563–.1565) in combination with the claimant's residual functional capacity ("RFC"). RFC is defined by Secretary as a (*Marcus v. Sullivan,* 926 F.2d 604, 608 (7th Cir.1991), quoting SSR 83–10):

medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).

RFC is expressed in terms of a claimant's maximum sustained work capability for ei-

ther "sedentary," "light," "medium," "heavy" or "very heavy" work as those terms are defined in Reg. § 404.1567.

Where an ALJ's findings of fact as to the vocational factors and RFC coincide with all the criteria of a particular Grid rule, the rule directs a conclusion of "disabled" or "not disabled." Because the Grid takes into account the number of unskilled jobs in the national economy at the various functional levels (Reg. § 404.1566), the existence of such jobs is established when the findings of fact coincide with the criteria of a rule (Reg. App. § 200.00(b)). However, nonexertional limitations (such as pain, inability to grasp objects or bimanual dexterity) are not reflected in Grid determinations. Hence Reg. App. § 200.00(e)(2) says:

However, where an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations. Also, in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this appendix 2, full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.

### Procedural History and Administrative Findings

Haddon applied for SSI on December 3, 1987, alleging disability due to bleeding ulcer and drug abuse as of March 1987 (R. 41–50). Secretary denied his application both initially and upon reconsideration, after determining

that Haddon's condition was not disabling (Supp.R. 1, 5).

Haddon then requested a de novo Hearing held before ALJ John Mondi on May 24, 1989 (R. 14–39). On September 14, 1989 ALJ. Mondi denied Haddon's application, finding (R. 183):

1. The claimant has not engaged in substantial gainful activity since December 3, 1987.

2. The medical evidence establishes that the claimant has a history of severe drug abuse, situational depression and anxiety, and peptic ulcer disease, but not an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3. The claimant's testimony was not credible because it was generally not supported by the objective evidence in the record, and included inconsistencies with the documentary evidence.

4. The claimant has the residual functional capacity to perform work-related activities except for work involving lifting at more than the light level. Additionally, the claimant is limited to the performance of unskilled work that does not involve access to controlled substances (20 CFR 416.965).

5. The claimant's past relevant work as security guard did not require the performance of the work-related activities precluded by the above limitation (20 CFR 416.965).

6. The claimant's impairments do not prevent him from performing his past relevant work.

7. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR 416.920(e)).

Haddon made a second application for SSI on October 4, 1989. Although that claim was initially denied on January 8, 1990, after another hearing ALJ Donald Niersbach granted Haddon's request for SSI benefits as of October 4, 1989 (R. 8). Hence what is now at stake are benefits for the period covered by his initial application and preceding the October 1989 date.

## Standard of Review

■ Section 405(g) empowers this Court to affirm, modify or reverse Secretary's decision, with or without remand for rehearing. Section 405(g) also provides, however, that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." As taught by many cases, including *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir.1987) (citation omitted):

[A]fter review we must accept the findings of the ALJ if supported by substantial evidence. In so doing, we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the ALJ.

"Substantial evidence" means (*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)):

more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

"Substantial evidence may be something less than the greater weight or preponderance of the evidence" (*Young*, 957 F.2d at 389), and a finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion (*Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986) (per curiam)).

■ Every ALJ has a duty to explain with particularity the basis of his or her decision. To quote once again from *Young, id.* 957 F.2d at 393, "within reasonable limits, the reason for rejecting evidence must be articulated if there is to be meaningful appellate review." *Stein v. Sullivan*, 966 F.2d 317, 319 (7th Cir.1992), quoting *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir.1988), expands on that concept:

While the [district] court recognized the existence of the rule requiring the Secretary to articulate his assessment of the evidence, the district court noted that the level of articulation required is far from precise. We agree. The requirement that the ALJ articulate his consideration is deliberately flexible. "It is enough if the ALJ indicates the path of the decision. . . .

The administrative tribunal need not spell out every step in the reasoning, if it provides enough of the steps that the full course may be discerned."

### Haddon's Arguments on Appeal

Haddon advances these arguments here:

1. ALJ Mondi failed adequately to consider the requirements of Haddon's past relevant work in determining that he could return to his former work;

2. the ALJ failed to give appropriate consideration to Haddon's non-exertional impairments: his drug addiction, his affective disorder and his pain;

3. the ALJ improperly discounted Haddon's credibility;

4. the ALJ improperly allowed issues of lifestyle to impact the disability determination; and

5. the ALJ's alternative finding that Haddon could perform any light work according to the Grid was inappropriate in light of Haddon's non-exertional limitations.

Those contentions are addressed in turn.

#### 1. *Inadequacy of Findings of Fact*

■ Haddon argues that ALJ Mondi improperly reached the step four decision that Haddon could return to his past occupation. In that respect *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir.1991) teaches that an ALJ has the affirmative duty to make these findings specified in SSR 82–62:

> In finding that an individual has the capacity to perform a past relevant job, the determination for decision must contain among the findings the following specific findings of fact:
>
> 1. A finding of fact as to the individual's RFC.
>
> 2. A finding of fact as to the physical and mental demands of the past job/occupation.
>
> 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

To make the second and third of those findings, "the ALJ must specify the duties involved in a prior job and assess the claimant's ability to perform the specific tasks" (*Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir.1991); *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir.1984)).

Haddon contests the second of the SSR 82–62 findings, urging that ALJ Mondi failed to consider the nonexertional demands of Haddon's former security guard position. Haddon's Mem. 6 says that "the ALJ failed to articulate, and thus presumably failed to consider, such things as the need for interaction with the public, regular attendance, alertness to detect potential problems, and the ability to act to prevent a crime in progress or about to occur."

In this case ALJ Mondi reviewed the nondisabling nature of Haddon's several impairments, and he then decided that Haddon had the RFC to do work at the light level that was not performed around controlled substances (R. 182). From that premise ALJ Mondi concluded that Haddon could return to his previous work as a security guard, noting that Haddon's previous work as a security guard required that he "patrol the parking lot of a lounge to insure that cars were not robbed," and that "no lifting was involved" (R. 182).

ALJ Mondi's reasoning was not faulty as was the ALJ's in *Strittmatter*. There the ALJ erroneously concluded the claimant could return to her past work because (1) her past work was sedentary in nature and (2) she could do *some* sedentary work. *Strittmatter*, 729 F.2d at 509 found that involved a logical fallacy because "sedentary work is not homogenous with respect to strenuousness." By contrast, here ALJ Mondi specifically concluded that Haddon could perform the demands of security guard work: patrolling an area and guarding against theft.

#### 2. *Adequacy of Consideration of Non-exertional Impairments*

Haddon next contends that ALJ Mondi failed adequately to consider his nonexertional impairments—his drug addiction, his affective disorder and his pain—in determining that Haddon could return to his past relevant work as a security guard.[7] In part (though

---

7. Haddon also suggests that ALJ Mondi failed to consider the combined effect of his impairments (P.R.Mem. 9). Not so: ALJ Mondi expressly

stated that "[t]he record fails to establish that the claimant has an impairment or combination of

not entirely) that argument fares better than the one just discussed.

### a. Mental Disorder and Drug Addiction

■ Haddon's R.Mem. 8 submits that ALJ Mondi impermissibly made findings on the severity of Haddon's mental disorder without expert testimony from a psychologist or psychiatrist. As Haddon notes, the ALJ determined that Haddon had an affective disorder that met the requirements of Part A of 20 C.F.R. Part 404, Subpart P, App. 1 § 12.04 of the listings (R. 181).[8] However, ALJ Mondi concluded that Haddon did not meet the requirements of Part B (R. 181).

In setting out his Part B analysis, ALJ Mondi stated that Haddon's "past depression and anxiety appear to be more situational than related to any severely debilitating ongoing mental impairment" (R. 182). ALJ Mondi cited notes from drug abuse counselling sessions at the VA showing that Haddon would become upset about marital problems or denial of visitation with his children (R. 181) and that his anxiety "appeared to lessen when those problems were resolved" (*id.*). Notes from the VA also said that Haddon's "depression seemingly lessened" after he decided to let his lawyer deal with his custody problems (Supp.R. 56); that later Haddon was "calm but excited" at having been granted visiting privileges as to his children; and that his counselor observed that he "contin-ues to project a positive attitude toward self and future endeavors" (Supp.R. 32–33). Other notes describe Haddon as "maintain[ing] a positive attitude," "appear[ing] to have inner strength to overcome adversity" (Supp.R. 58) and making an effort to find a job (Supp.R. 51); speak of him as "show[ing] self-esteem and confidence" (Supp.R. 43); and quote him as saying "my depression comes when I think of my children, I'll have to become more active, I'm going to enroll in school" (R. 44–45).

Other notes from counseling sessions observed that Haddon was "socially isolated" and had "low frustration tolerance" (Supp.R. 56, 54) and that on occasion he was depressed (Supp.R. 57, 59, 46). When ALJ Mondi asked at the Hearing whether he had problems getting along with others, Haddon stated "No, I don't be around people that much" (R. 26). He explained that was because "they got a lot of problems and I be having problems and you just add on more problems, so I just try to keep to myself" (R. 26–27). In a phone conversation with a nurse from the Bureau of Disability Determination Services ("DDS"), Haddon reported that he did not mingle, had only brief contact with others and was apt to take offense and be suspicious of others (Supp.R. 23–24). That DDS representative reported that Haddon was "brusque, abrupt and wanted to

---

impairments that meets or equals any section of the listing of impairments" (R. 181). Whether that conclusion was supported by substantial evidence in the record is another matter.

8. Here is Section 12.04:

12.04, *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking;

\*   \*   \*   \*   \*   \*

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

know why I was asking him these questions" (Supp.R. 24).

■ Of course it is the claimant's burden, not the ALJ's or Secretary's, to provide medical evidence of a mental impairment (*Howell v. Sullivan,* 950 F.2d 343, 348 (7th Cir.1991); Reg. §§ 404.1514 and .1508)). Once a claimant has done so, the regulations require completing of a standard Psychiatric Review Technique Form ("PRTF") (Reg. § 416.920a(d)). However, a consultative examination is not required unless it is necessary for the ALJ to make a decision (*Howell,* 950 F.2d at 348). No error can be ascribed to ALJ Mondi's determination that the evidence of Haddon's tendency to stay away from others and to be depressed on occasion did not warrant the ordering of a consultative exam.

■ But the ALJ's handling was flawed in another respect. In this circuit Haddon's substance abuse disorder calls into play the rule that where substantial evidence of chronic substance abuse has been presented, the decision whether to order a psychological examination is no longer discretionary (*Stambaugh v. Sullivan,* 929 F.2d 292, 296 (7th Cir.1991)). Although *Stambaugh* and other like cases involve claimants with chronic alcoholism (see *Howell,* 950 F.2d at 348 and cases cited there), addiction to heroin is equally likely to interfere with a claimant's ability to engage in substantial gainful activity. Indeed, the regulations treat all "Substance Addiction Disorders" in the same way for purposes of determining disability (Part 404, Subpart P, App. 1 § 12.09) (see also *Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir.1980), ordering a remand where the ALJ failed to develop evidence of claimant's excessive use of Librium).

What *Stambaugh,* 929 F.2d at 296 said in criticizing an ALJ's cursory treatment of substance addiction applies equally well in this case:

The ALJ found that the alcoholism did not constitute an impairment because Stambaugh was able to control his drinking through attendance at several AA meetings. The ALJ seemed to assume that if a chronic alcoholic can remain temporarily sober, any non-exertional impairments associated with the disease evaporate. However, the ALJ did not support this conclusion with reference to any expert evidence. In the absence of expert opinion, the ALJ should not have attempted to make a finding of whether or not the alcoholism was impairing Stambaugh's ability to work.

As to Haddon's drug addiction, ALJ Mondi stated "With respect to the claimant's history of drug abuse, I note that he has apparently been drug free for some time" (R. 182). Haddon testified at the Hearing that he had not used illegal street drugs for a year (R. 22). Notes from the VA listed Haddon's last positive urine screen as July 7, 1988 (Supp.R. 49).[9]

Unlike the ALJ in *Stambaugh,* ALJ Mondi did complete the PRTF, noting on it that Haddon's drug addiction disorder was "in remission" (R. 185–87). However, ALJ Mondi reached his conclusion without the input of a psychologist or psychiatrist. It is true that Dr. Chen filled out a report on Haddon, noted his methadone use (R. 71–73) and reported that Haddon's mental status was "normal" (R. 72–73). Dr. Chen found that Haddon was "oriented to time, person and place. He is able to concentrate and to relate. He has not lost touch of reality" (R. 73). However, Dr. Chen is an internist (Supp.R. 27). It is also true that Dr. Gupta filled out a "Psychiatric Report" sent to him by the DDS (R. 57–60). But in stating that Haddon was capable of a full range of activities, including taking care of himself and his affairs and working, Dr. Gupta did not mention Haddon's methadone or illegal drug usage at all. And although the record contains no professional qualification for Dr. Gupta,

9. Haddon argues that the fact that Haddon resumed daily use of heroin shortly after the Hearing "casts serious doubt on the validity of the ALJ's conclusion" (P.Mem. 12). Throughout his memoranda Haddon urges this Court to consider evidence generated after the first Hearing and used by ALJ Niersbach in granting Haddon's second application for benefits. That would be wholly at odds with this Court's role as a reviewing court. Haddon cannot find support in *Halvorsen v. Heckler,* 743 F.2d 1221, 1225–26 (7th Cir.1984), which dealt not with evidence generated after the hearing at issue, but with evidence presented to the ALJ at the hearing that he clearly had not considered in reaching his decision.

he treated Haddon for his ulcer at Englewood Hospital and at Dr. Gupta's clinic. It seems safe to assume he is not a psychiatrist.[10]

Nothing in the record provides any evidence on the key issue of the effect of Haddon's drug addiction on his ability to work. And Haddon rightly points out that he was not "drug free"—he used 20 milligrams of methadone daily (R. 24).[11] ALJ Mondi should have ordered a psychological examination of Haddon (*Schmoll*, 636 F.2d at 1150). Lacking such evidence, this Court cannot affirm the ALJ's determination that Haddon's drug addiction and his daily use of methadone, either singly or in combination with his other impairments, did not affect his ability to work. Remand is essential to develop the record on that point. As *Ray v. Bowen*, 843 F.2d 998, 1007 (7th Cir.1988) says:

> Whether or not the passage of time precludes a reliable retrospective assessment of [claimant's] mental condition during the covered period should be left to the examining physician, who will be in a better position to make that determination.

b. Pain

Haddon testified that he had stopped looking for work because of the pain in his stomach and his back (R. 21, 33), but the ALJ found Haddon's testimony less than fully credible. Thus consideration of this element of Haddon's claim dovetails with his contention that the ALJ improperly discounted Haddon's credibility (P.Mem. 12–13), which is addressed in the next section.

3. *Credibility Determination*

■ *Herr v. Sullivan*, 912 F.2d 178, 182 (7th Cir.1990) (citation omitted) is typical of the many cases that reflect the limited role of the district judge as to witness credibility:

> An ALJ's credibility determinations will be affirmed on appeal unless the appellant can demonstrate that they are "patently wrong."

Reviewing courts generally uphold credibility judgments because the trier of fact has a unique opportunity to observe and evaluate the witnesses. As *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) has put it:

> [O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.

■ ALJ Mondi found Haddon's testimony not credible because "he tended to exaggerate his physical complaints and made inconsistent or false statements as to looking for work and his drug usage" (R. 182). In part the ALJ found that "[t]he claimant's testimony was not credible because it was generally not supported by the objective evidence in the record, and included inconsistencies with the documentary evidence" (R. 183).

Although Haddon said at the Hearing that he had not looked for work since 1979 because the pain was too intense (R. 21), the record showed Haddon had told counselors at the VA on many occasions that he was looking for work regularly and had job interviews (Supp.R. 38, 42, 55, 57–59, 64). Haddon also reported receiving a copyright for an envelope design and making efforts to sell it (Supp.R. 41–42, 49).

ALJ Mondi was faced with contradictory evidence: Haddon's testimony that his pain prevented him from working, and Haddon's statements to others that he had made considerable efforts to find work. It is not the

---

10. In fact, Dr. Gupta's answers to the three questions in the "Level of Daily Functioning" section were perfunctory at best: as to "present daily activities" Dr. Gupta said Haddon was "capable of doing full daily activity," as to "present interests" Dr. Gupta wrote "do not know" and as to "interpersonal relationships" Dr. Gupta wrote "appear [sic] well behaved" (R. 58). That does not constitute sufficient evidence to determine what effect Haddon's drug addiction disorder had.

11. Physician's Desk Reference 1294 (47th ed. 1993) lists methadone as a Schedule II narcotic, to be used for relief of severe pain, for detoxification treatment of narcotic addiction and for "temporary maintenance treatment of narcotic addiction." Methadone can produce psychic and physical dependence and tolerance (*id.*). Adverse reactions include lightheadedness, dizziness, sedation, nausea, vomiting and sweating (all of those are most frequently observed), as well as such other reactions as euphoria, dysphoria, weakness, headache, insomnia, disorientation and visual disturbances (*id.* at 1295).

function of this Court to revisit the ALJ's choice to credit the latter rather than the former.

### 4. *Improper Introduction of "Issues of Lifestyle"*

■ Haddon argues that the ALJ's mention of his drug dealing activities indicated an impermissible injection of issues of lifestyle into the determination of Haddon's ability or lack of ability to work. Haddon is correct that "neither the ALJ nor the court on review is authorized to pass judgment upon the source of a medically ascertainable disability" (*Nelson v. Bowen*, 855 F.2d 503, 506 (7th Cir.1988)). But a review of the ALJ's decision does not reflect that Haddon's disability claim was denied because ALJ Mondi disapproved of his drug dealing. Rather, ALJ Mondi cited to Haddon's drug dealing as evidence that Haddon had "the memory, and organizational and social skills consistent, at the very least, with the ability to meet the demands of unskilled work" (R. 182).

### 5. *Application of Grid as an Alternative*

As already stated, the ALJ decided Haddon's claim at step four of the five-step process dictated by Reg. § 404.1520. In addition, the ALJ made the alternative finding that Haddon was able to perform *other* light work based on the Medical–Vocational Guidelines (the "Grid").

To streamline the step five analysis of whether a claimant's RFC is sufficient to perform some job in the economy, the Secretary has promulgated the "Grid": a series of tables in Reg. Part 404, Subpart P, App. 2 that relate the RFC to the vocational factors of age, education and relevant work experience. Once the ALJ has determined the category (light, medium or heavy work) into which a claimant's RFC falls, the ALJ consults the Grid and finds the row of the table (also referred to as the "Rule") that matches the claimant's RFC with his or her age, education, and relevant work experience. That done, the right-hand column in the relevant row of the table prescribes the conclusion (either "disabled" or "not disabled") that the ALJ must reach in determining the claimant's eligibility for disability benefits.

In this instance ALJ Mondi found that Haddon's RFC for light work, combined with his age (39), ten years of formal education and past relevant unskilled work required a conclusion pursuant to Grid Rule 202.17 that Haddon is not disabled. Haddon argues that ALJ Mondi's use of the Grid is improper in light of Haddon's nonexertional impairments. Moreover, Haddon contends that ALJ Mondi was required to take testimony from a vocational expert to determine what jobs Haddon could perform.

■ Secretary should use the Grid only when the factors reflected there adequately describe the claimant's characteristics (*Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir.1986) (per curiam)). As a rule, where a claimant suffers from nonexertional impairments that significantly compromise his or her ability to engage in the full range of employment activities that sheer physical capacities would otherwise allow, Secretary may not mechanically apply the Grid. Where such impairments constitute severe restrictions on a claimant's physical ability to work, *DeFrancesco v. Bowen*, 867 F.2d 1040, 1045 (7th Cir.1989) counsels Secretary to call for the opinion of a vocational expert as to whether the claimant remains capable of performing any job in the economy. But "[w]here the evidence supports it, an ALJ is permitted to conclude that a non-exertional limitation, while present, has no significant impact on a claimant's capacity to perform the range of work the individual is otherwise exertionally capable of performing, and that the Guidelines therefore apply" (*Smith v. Schweiker*, 735 F.2d 267, 272 n. 3 (7th Cir. 1984)).

■ Haddon's substance addiction, affective disorder and pain would constitute nonexertional impairments. However, ALJ Mondi specifically stated (albeit at an earlier point in his opinion) that Haddon had been drug free for some time and that his anxiety and depression "appear to be more situational than related to any severely debilitating on-going mental impairment," and it has already been noted that the ALJ did not credit Haddon's testimony as to his pain (R. 182).[12]

---

**12.** ALJ Mondi did observe that Haddon could not perform work around controlled substances.

That is a clear and minimal limitation, and not

Hence ALJ Mondi's resort to the Grid and his failure to call in a vocational expert would not of themselves have been procedural error.

But this opinion has already held that the dearth of evidence as to the psychological ramifications of Haddon's substance addiction renders untenable ALJ Mondi's finding that Haddon's nonexertional impairments did not constitute severe restrictions on his ability to work. For that reason, the ALJ's alternative finding that Haddon could perform any light work that was not performed around controlled substances cannot stand.

### Conclusion

This action must be remanded to secure psychiatric testimony as to the effect of Haddon's substance addiction disorder on the existence or nonexistence of a disability as of the time frame dealt with in the Hearing. Two added points should be made as to the remand:

1. To assure Haddon a fair hearing, the case must be assigned to a different ALJ. Even though a good many of ALJ Mondi's findings have been upheld here, some of them were sufficiently marginal so that a fresh look is called for to make sure that the new evidence is not inevitably (though perhaps subliminally) prejudged.

2. Because the remand *is* one for the taking of additional evidence that was not available at the time of the Hearing, it is a "sentence six" remand (see *Melkonyan v. Sullivan*, —— U.S. ——, 111 S.Ct. 2157, 2163–64, 115 L.Ed.2d 78 (1991)).

## ON MOTION TO ALTER OR AMEND

This Court's March 19, 1993 memorandum opinion and order [see page 1141] (the "Opinion") remanded this action to Secretary of Health and Human Services Donna Shalala ("Secretary") for the taking of additional evidence. Secretary has now filed a timely motion and supporting memorandum to alter or amend that judgment under Fed.R.Civ.P. ("Rule") 59(e).[1] For the reasons stated here, that motion is granted in part and denied in part.[2]

Secretary disputes one substantive and two procedural aspects of the Opinion. As to the matter of substance, Secretary is simply wrong, while her complaints on procedural issues are well founded.

In substantive terms, Secretary incorrectly argues that the ALJ's completion of a PRTF satisfies the requirements for evaluation of a mental impairment. But as Opinion at 1147–48 points out, what poses the problem here is not the failure to fill out such a report, but rather the lack of professional support for the ALJ's evaluation that was reflected in that report.

Secretary seeks to bootstrap herself by pointing to two other PRTFs by psychologist Stephen Vincent ("Vincent"), one dated February 16, 1988 (R. 62–70) and the other dated April 20, 1988 (R. 80–88). But the problem in that respect is that ALJ Mondi's report says not a word about *those* PRTFs in his detailed Evaluation of the Evidence (R. 180–83). Here is the totality of what the ALJ said about the issues related to Haddon's drug and related mental problems (R. 181, 182):

> Extensive outpatient notes from the Veterans Administration between October 19, 1987, and April 7, 1989, document that the claimant sought treatment on October 19, 1987, for a drug abuse problem, including a heroin addiction. Eventually, he began taking methadone. While urine testing showed the presence of drugs occasionally, later testing, particularly those from 1989, document that the claimant had curtailed drug usage. The claimant frequently reported to his counselor at the Veterans Administration that he was seeking employment. Significantly, however the entry dated March 7, 1989, reveals that the

the type referred to in SSR 83–12's statement that "where the extent of erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource" (see *DeFrancesco*, 867 F.2d at 1045).

1. As a technical matter, Rule 59(e) may not be in play at all. As the Opinion was written, the remand was ordered under sentence six of Section 405(g)—and as such, it would not be a final judgment order. But Secretary's motion is timely no matter what label attaches to it.

2. This opinion assumes complete familiarity with the Opinion and, consistently with that assumption, employs the same defined terms without repeating the definitions.

claimant was selling illegal drugs. Apparently, he was actively involved in that occupation, and had a supply network with distributors who worked with him. The claimant justified this activity as necessary to make ends meet (Exhibit 24).

\* \* \* \* \* \*

The record fails to establish that the claimant has an impairment or combination of impairments that meets or equals any section of the listing of impairments. I have evaluated, in particular, his alleged mental disorder. I note that his substance addiction disorder appears to be in remission (Exhibit 24). I find that he does suffer symptoms of an affective disorder, and meets the "A" criteria in section 12.04 of the medical listing of impairments, but has not manifested the required degree of functional limitation to meet the requirements of the "B" criteria for that listing.

\* \* \* \* \* \*

With respect to the claimant's history of drug abuse, I note that he has apparently been drug free for some time. Furthermore, his past depression and anxiety appear to be more situational than related to any severely debilitating on-going mental impairment. I note that the claimant's activity of selling drugs may not actually be substantial gainful activity, but it does establish that he has the memory, and organizational and social skills consistent, at the very least, with the ability to meet the demands of unskilled work. The claimant's testimony was less than fully credible: he tended to exaggerate his physical complaints and made inconsistent or false statements as to looking for work and his drug usage (*see* Exhibit 24 note of January 15, 1988).

It is, of course, an ALJ's duty to make the bases for his or her opinion plain to enable effective review by a district court. Although the quoted language refers to evidence relied on by the ALJ (Exhibit 24, comprising the VA outpatient notes), *no* reliance whatever was placed on Vincent's reports.[3] It simply will not do for Secretary to pull matters out of the record as purported support for the ALJ's decision where—as in this case—the ALJ himself has not stated any reliance on such matters. Accordingly, this Court remains of the view that a remand is not only appropriate but necessary to assure a full and fair hearing and a fair result on Haddon's claim.

■ As for the first of Secretary's procedural contentions, this Court directed reassignment of the case to a different ALJ on the remand. That was a reflection of this Court's view that many of ALJ Mondi's findings, though this Court upheld them based on the generous standard of review that is accorded to an ALJ's decisions, were troublesome enough to pose a serious risk of prejudgment of the result on review. Although that concern remains, our Court of Appeals has recently announced a more restrictive review of such directives for reassignment in *Travis v. Sullivan,* 985 F.2d 919, 924 (7th Cir.1993).[4] Accordingly this Court will not order assignment to a different ALJ. Instead this Court (taking a leaf from *Travis, id.*) "strongly urges" that Secretary do so.

■ Finally, Secretary urges that the remand should be viewed as a "sentence four" rather than "sentence six" remand (see *Melkonyan v. Sullivan,* —— U.S. ——, ——, 111 S.Ct. 2157, 2163–64, 115 L.Ed.2d 78 (1991)). That distinction has been one of the more vexing problems in this area of law, clearly calling for clarification and correction by Congress. But because the statutory language (which may literally be read to encompass what this Court has ordered here) has had a more restrictive gloss placed on it by case law (including some of the language in

---

3. Even if ALJ Mondi had explicitly relied on Vincent's PRTFs (as he did not), nothing in the record indicates whether those forms—which themselves contain no notes or even show that Vincent evaluated Haddon in person—could satisfy the ALJ's duty to "inquire[ ] into the present status and possible effects of plaintiff's [substance abuse disorder]" (*Thompson v. Sullivan,* 933 F.2d 581, 587 (7th Cir.1991)).

4. It does seem somewhat ironic that our Court of Appeals' own rules on the reversal and remand of a district judge's decision sensibly contemplate reassignment of the case to a new district judge where similar concerns are present. Are ALJs presumptively more reliable than Article III judges? All the same, this Court will of course follow the *Travis* directive.

*Melkonyan*), this Court grants Secretary's motion to that extent.

## Conclusion

No change will be made in the substantive ruling contained in the Opinion, and Secretary's motion is denied in that respect. But the ultimate result in this case is changed to a reversal of Secretary's decision, with a "sentence four" remand for the purpose stated in the Opinion. It is strongly urged that the further proceedings on remand should be conducted by an ALJ other than ALJ Mondi.