Ernest E. NOLEN, Plaintiff–Appellant,

v.

Louis W. SULLIVAN, Secretary, Department of Health and Human Services, Defendant–Appellee.

No. 90–1161.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1991.

Decided Aug. 13, 1991.

Donald J. Hanrahan (argued), Land of Lincoln Legal Assistance Foundation, Springfield, Ill., for plaintiff-appellant.

Denise McDuffie Martin (argued), Dept. of Health and Human Services, Region V, Office of the General Counsel, Chicago, Ill., James A. Lewis, Asst. U.S. Atty., Springfield, Ill., for defendant-appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Ernest Nolen applied for disability insurance benefits in 1986, claiming that he was disabled before his insured status expired in 1985. After a hearing, the administrative law judge (ALJ) concluded that Nolen could have returned to his previous job at the end of his insured status. The Appeals Council denied Nolen's petition for review, and the district court affirmed. Nolen's appeal contends that the ALJ erred in finding him able to perform his former work and in selecting November 10, 1986—the date of his application—as the onset date of his disability.

## I.

Nolen worked from 1954 to October 1980 at A.O. Smith Company, a manufacturer of car frames. Fifty-nine years old at the time of his hearing, he has endured many problems with his legs and feet. As a child, he contracted polio. In 1973 his doctors conducted two operations to fuse his left ankle; he missed work and received disability insurance benefits (DIB) from March 1973 to August 1974 and from February 1975 to August 1976. Arthritis developed in both knees, for which Nolen began seeing an orthopedic surgeon, Dr. Hayes, in the spring of 1984. In May 1984 he underwent an arthroscopic evaluation, an intra-articular debridement and a removal of loose bodies on his right knee. Similar problems developed in the left knee, and Nolen endured surgery again in March 1985. He began a therapy program, but in October 1986 another operation was required on the left knee.

Nolen's doctors recorded his condition in a series of examination reports following the surgeries. After the first surgery, reports on May 25, June 22 and August 17, 1984, by Dr. Punnoose, Nolen's attending physician, indicated Nolen to be doing "reasonably well" and able to lift weights up to ten pounds for exercise. R. 200–02. Following the second surgery, Dr. Punnoose's reports of March 15, 18 and 22, 1985, reported Nolen to be "doing reasonably well" and also suggested lifting weights. R. 193–95. The medical reports do not indicate that either Dr. Hayes or Dr. Punnoose considered Nolen fit to return to his job.

By 1978, foot and leg problems led to Nolen's transfer at A.O. Smith from welding to the "loan out" crew and then to the paint house. Nolen testified that the painting job reduced his pay by at least a dollar an hour. He also testified that even the less demanding painting position proved difficult because it included climbing ladders and working in slippery conditions.[1] The A.O. Smith plant closed in 1980, and Nolen did not work thereafter.

---

1. The transcript contains the following testimony before the ALJ:

Question [by Nolen's representative]: Were you having difficulty doing the things you had

Nolen's insured status for DIB expired on December 31, 1985. ALJ Decision at 3. He applied for benefits in 1986, claiming a disability onset date of June 1, 1981. The ALJ found that he was disabled as of the date of his application—November 10, 1986 —but not before, entitling him to Supplemental Security Insurance benefits (SSIB) but not DIB.

Nolen then sought review by the Appeals Council, which was denied on May 26, 1988. Nolen supplemented the record with a March 7, 1988, letter from Dr. Hayes, which contends that Nolen was disabled and unable to return to work as of 1984. On August 10, 1988, the Council notified Nolen that the letter did not affect its decision. The district court, affirming, found the letter inconsistent with Dr. Hayes' evaluations following the March 1985 surgery, citing 20 CFR §§ 404.1527, 416.927. The judge apparently concluded that the earlier notes, documenting Nolen's recovery from surgery, indicated Nolen was not disabled.

## II.

### A. *Demands of Previous Job.*

■ One step in the Secretary's review of a DIB or SSIB claim is assessing wheth-er a claimant can perform the demands of his prior job. 20 CFR §§ 404.1520(e) & 416.920(e) (1987).[2] Even if the claimant is unemployed and his disability is severe, an ability to perform the claimant's previous job disqualifies him from receiving DIB. In *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir.1984), we held that an ALJ cannot describe a claimant's job in a generic way— there, "sedentary"—and conclude, on the basis of the claimant's residual capacity, that she can return to her previous work. Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks. *Id.* at 509; *see also* S.S.R. 82–62 (1982) ("Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work.").

■ Nolen contends that the ALJ did not evaluate the specific demands of his previous job in determining that he was able to return to work. Initially, we note that Nolen may not have presented this claim adequately to the ALJ or the district

---

to do in the paint house by the time they closed [the plant] down?
Answer [Nolen]: I was having difficulty by climbing the ladder but I'd grin and bear it.
Q: Are there any things that you had to do in the paint house that you can't do anymore?
A: Climb a ladder—
Q: Where did this ladder lead?
A: Well—you either climbed a ladder to change paint nozzles—
Q: Yeah—
A: —in the paint room or—and you'd have to have somebody down at the bottom holding it 'cause it was always four or five inches of paint—we've have tarps down there—
Q: Where else did you have to climb?
A: Climb the outside of the building up the side the building and go into the ovens.
Q: So that's another thing that you couldn't do now?
A: Right.

Q: In the paint house, did you have to walk in slick paint?
A: When I went into change the nozzles, yes.
Q: Would that cause you to fall?
A: Yep.

Q: Were you able to get up when you did fall?
A: Well, you always had somebody there to help you.
Q: You needed somebody else to help you get up?
A: Right.
R. at 48–50.

**2.** We outlined these steps in an earlier decision:

The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520 (1983). *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir.1984).

court. His original benefits application did not mention ladder climbing. Nonetheless, the claim is here cognizable for three reasons. First, the Secretary has "waived the waiver" issue by not mentioning until oral argument Nolen's possible failure to raise the issue correctly below. *United States v. Rodriguez*, 888 F.2d 519, 524 (7th Cir.1989). Second, the requirement of ladder climbing emerged clearly from Nolen's testimony before the ALJ. *See supra* n. 1. And third, the claim appeared in some form before the district court, which noted, "Plaintiff testified that he occasionally was required to climb ladders at work to clean out the paint nozzles and that such work was dangerous due to the paint making the floor extremely slippery." Order at 4.

With respect to his claim, Nolen is right; the ALJ's decision does not list the demands involved in Nolen's paint mixing job. The ALJ classified Nolen's previous job as "unskilled at the light exertional level, as provided by 20 CFR 404.1567 and 416.967." Decision at 3. There is no description of the tasks the job entailed. In deciding that Nolen was able to return to such work, the ALJ relied on the absence of complaints by Nolen to his doctor about his knees during 1985. For example, the ALJ thought important Dr. Punnoose's note that "the claimant's knee condition was rather stable prior to December 31, 1985." Decision at 3. The ALJ concluded that Nolen retained the residual functional capacity "to return to his past relevant work" and that, had the plant not closed, Nolen would have been able to return to work. *Id.* These findings fall short of *Strittmatter*'s demand for facts describing Nolen's previous duties and an assessment of Nolen's ability to perform them.

■■■ We reiterate that the ALJ must specify the duties involved in a prior job and assess the claimant's ability to perform the specific tasks. *Strittmatter* clearly states:

> To determine whether [a claimant] is physically capable of returning to her former work, the administrative law judge obviously must ascertain the demands of that work in relation to the

claimant's present physical capacities, see 20 C.F.R. § 404.1520(e); *Mental Health Ass'n v. Heckler*, 720 F.2d 965, 968 (8th Cir.1983); *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir.1983)—at least where, as in this case, there is evidence that the claimant's impairments are worse today than when she was working. 729 F.2d at 509. The ALJ's opinion does not, for example, mention Nolen's claim that he could not climb ladders or his claim that he had to walk on floors dangerously slippery with standing paint. We therefore remand the matter for the ALJ to determine the demands of Nolen's job and, based on the evidence available, his ability to meet them during his insured status.

B. *Selection of Disability Onset Date.*

■■■ Nolen also contends that the ALJ's selection of November 10, 1986, as the disability onset date is unsupported by substantial evidence. The Secretary's procedure for determining onset is outlined in S.S.R. 83–20. The starting point is the claimant's alleged onset date. The ALJ adjusts this date by considering the applicant's work history. The ALJ then further adjusts the date in light of medical reports describing examinations or treatment of the individual. This procedure is inherently inferential, as regulation and case law acknowledge:

> With slowly progressing impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

S.S.R. 83–20 (1983); *see also Lichter v. Bowen*, 814 F.2d 430 (7th Cir.1987).

There appears to be no reason for the ALJ's selection of November 10, 1986. Although the ALJ and district court purported to rely on three sources of evidence, none of this evidence points to that date

and none of it is relevant to the specific requirements of Nolen's former work. First, the notes and diagnoses of Dr. Hayes and Dr. Punnoose cited by the ALJ do not suggest November 10, 1986, and are not related to Nolen's former job. Dr. Hayes' office notes (listing Dr. Punnoose as the attending physician) of April 19, 1985, merely state that Nolen was generally doing "reasonably well" following the March 1985 surgery. The April 19 notes state that:

> [Nolen is] doing reasonably well. No effusion present, but he does have some soreness intermittently. He's only 6 weeks post-debridement. We'll start him on weight lisfting [sic]. He is currently taking the Feldene and should continue on this.

R. 193. The notes also include favorable reports of Nolen's recovery on March 15 and 22, but they do not directly evaluate Nolen's ability to work. In addition, he had further surgery on September 23, 1986.

The second source of evidence, discussed by the district court, was a residual functional capacity assessment by Dr. Hulio Pardo, a reviewing physician, who, on the basis of a review of Nolen's medical history, concluded that he was not disabled. R. 98. The February 1987 report concluded that Nolen was not even at that time disabled, which is inconsistent with any onset date. Dr. Pardo based his conclusion on Nolen's medical history and the notes of Dr. Hayes and Dr. Punnoose. The district court considered Dr. Hayes' own review, dated July 21, 1987,[3] to be consistent with a finding of not disabled and the doctor's letter, dated March 7, 1988, to be inconsist-

ent with his earlier notes.[4] On remand, the ALJ must, in determining onset, relate the evidence in the doctors' reports to the claimant's previous job demands.

Finally, the ALJ's discussion of Nolen's claims of severe pain omits discussion of certain relevant factors and does not directly support the November 1986 date. The ALJ observed, "In this case, the claimant's testimony, regarding his symptoms and pain, are certainly not consistent with the medical signs and finds [sic] contained in the numerous medical reports prior to December 31, 1985." Decision at 4. The ALJ concludes that Nolen's subjective accounts of pain are not substantiated by clinical or laboratory techniques. *Id.* at 5. This overlooks certain key facts. In December 1984 Nolen saw Dr. Hayes for pain and "giving away" of the left knee. The diagnosis was early osteoarthritis in the left knee and possible recurrent dislocation of the patella. R. 199 ("left knee pain"). The doctor prescribed Feldene, an anti-inflammatory pain medication. *Id.* Following Nolen's March 1985 surgery, his anti-inflammatory pain medication was continued, R. 190 (notes of May 17, 1985), refilled on July 26, 1985, R. 162, and changed to Tolectin in October 1985, when Nolen also complained of upper body pain. R. 161. Finally, from November 1985 through September 1986, Dr. Punnoose continued to see Nolen, hearing complaints of pain (notes of Jan. 15, 1986, indicate "knees hurting") and continuing pain medication. R. 157–60. The ALJ's determination of whether Nolen's accounts of pain support an onset date of November 10, 1986, must consider these factors in terms of Nolen's former job de-

---

3. Dr. Hayes wrote:
   This gentleman has bilateral osteoarthritis of the knees and old ankle fusion and history of polio involving primarily the left lower extremity. With these types of problems he is not able to carry out any type of manual work or work requiring squatting, kneeling, stooping, balancing, etc.
   R. 209.

4. Dr. Hayes' letter states in part:
   [Nolen's] limitations as regarding to climbing, balancing, stooping, kneeling, crouching, crawling, and etc. have [in] effect been in

place since prior to 1984. During the time I have known this gentleman as a patient, that is since 1984, he has not been able to work as a painter.

 .    .    .    .    .

   [W]ith his ankle fusion and the knee conditions that he has it is very reasonable to state that the anatomical pathology of his knees were such that he could not reasonably expect to perform work as a painter from the time I initially saw him in 1984 to and including the present and the future.
   R.Ex. 14.

mands and the relation between pain and his ability to work.

The ALJ provided no reason for an onset date of November 10, 1986. S.S.R. 83–20 obligates the ALJ to infer through medical evidence and work history the onset date, starting with the claimant's assertion. We vacate and remand for redetermination of the onset date.

### III.

We REVERSE the district court's holding and REMAND the case for further proceedings consistent with this opinion.