Coventry v. HHS                    CV-94-72-JD    03/27/95

UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE


Jeffrey Coventry

        v.                               Civil No. 94-72-JD

Secretary, Health and
Human Services


                         O R D E R


     The plaintiff, Jeffrey Coventry, brings this action pursuant

to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g),

seeking review of a final determination of the secretary of

Health and Human Services ("Secretary") denying his claim for

disability insurance benefits.  Before the court are the

plaintiff's motion to reverse the decision of the Secretary and

remand for further proceedings (document no. 10) and the

defendant's motion to affirm the decision of the Secretary

(document no. 7).



                         Background

     The plaintiff was thirty-five years old at the time of the

administrative hearing.  Transcript of Administrative Record

("Tr.") 39.  He has completed fourteen years of education

including an associates degree.  Tr. 42.  He formerly worked as

an electrical drafter, Tr. 43, a computer drafter, Tr. 46-47, and a construction equipment operator.  Tr. 92.

## I.  Medical History[1]

The medical record indicates that treatment began August 22, 1990, for pain resulting from a back injury occurring on August 21, 1990.  Tr. 191, 195.  Dr. Neil J. Markwith prescribed medication, and interpreted test results from August 23, 1990, and August 28, 1990, as compatible with a bulging or herniated disc at L5-S1 on the left.  The plaintiff was referred to an orthopedic surgeon, Dr. David G. Publow.

On September 5, 1990, Dr. Publow examined the plaintiff, reviewed x-rays and a CT scan, and diagnosed the plaintiff with sciatica from a disc bulge, which, in his opinion, was probably resolving.  Supportive care and physical therapy were recommended.  Tr. 203.  On September 19, 1990, Dr. Publow noted that the plaintiff exhibited an improved condition from therapy, and opined that improvement would continue.  Notes from October 2, 1990, describe some tightness and soreness in the plaintiff's low back, aggravated by long driving.  However, the plaintiff exhibited great improvement as to muscle spasm and leg pain.  The

---

[1]The court's recitation of the plaintiff's medical condition is drawn largely from the stipulation of facts filed jointly by the parties.

2

doctor recommended continued therapy including use of a transcutaneous electrical nerve stimulator ("TENS unit"), and indicated that the plaintiff's condition should gradually improve over time. Tr. 203. Notes from October 24, 1990, disclose gradual improvement due to therapy, exercises, and the TENS unit. Dr. Publow noted further improvement after a November 28, 1990, evaluation. Tr. 204.

Progress notes from the Chiropractic Association of Bedford, New Hampshire, ("CABNH") document treatment of the plaintiff beginning on January 3, 1991, for complaints of soreness in the ribs and back. Tr. 206-208. An interim report dated August 26, 1991, indicates a diagnosis of sacroiliac dysfunction and lumbar radiculopathy. Tr. 213. The plaintiff was receiving chiropractic spinal manipulative therapy, and reported a thirty percent overall improvement and an eighty to ninety percent improvement of the mid back.

Progress notes from CABNH dated February 5, 1992, indicate the plaintiff's low back was sore, but the upper back was reported as "o.k." Tr. 207.

Progress notes from CABNH dated February 28, 1992, through June 10, 1992, disclose that the plaintiff continued to experience soreness and low back pain, and that the plaintiff received treatment in the form of exercises and medication. Tr.

3

230-34. The plaintiff's upper back improved through use of a back brace, Tr. 231, while the low back continued to be sore, aggravated by leaning or lying on the floor. Tr. 232. Notes from May 22, 1992, disclose that the plaintiff was more active at home and was exercising daily for fifteen to twenty minutes. The notes through June 10, 1992, indicate that the plaintiff continued to complain of back and hip soreness. Tr. 234.

Dr. David J. Nagel, a specialist in physical medicine and rehabilitation, referred the plaintiff to Dr. Albert Drukteinis, a psychiatrist. On August 13, 1992, Dr. Drukteinis prepared a psychological back profile, which consisted of evaluation and testing to determine if psychological or emotional factors were aggravating the plaintiff's pain condition. Tr. 274-81. The testing also included counselling sessions to develop coping skills for mastering a chronic pain condition. Tr. 274. Dr. Drukteinis reports that the plaintiff was pleasant, talkative, and cooperative, although he exhibited considerable pain behavior (e.g., guarding, bracing and grimacing). According to Dr. Drukteinis, "there is still a great deal of pain behavior, depression and other emotional aspects to his problem." Tr. 275. The doctor stated the plaintiff's sporadic use of Elavil made him susceptible to side effects. Tr. 275.

4

According to Dr. Drukteinis, the battery of tests he administered showed the plaintiff to be a person with a capacity for marked somatization,[2] moderately marked anxiety and significant depression. Tr. 276. The doctor considered the plaintiff to be moody and unpredictable. Tr. 278.

Dr. Drukteinis reports that the plaintiff's score on the Beck Depression Inventory ("BDI") indicated a mild to moderate degree of depression. Tr. 279. The doctor noted that the plaintiff reported moderate to marked endogenous anxiety on the Patient Anxiety Scale ("PAS"). The doctor stated that patients with endogenous anxiety "frequently have spontaneous, autonomous, clonic, phasic episodes with one or more accompanying somatic complaints." Tr. 279. The doctor reported the plaintiff registered a tendency to hysteriam depression and hypochondriasis indicative of a poor prognosis using the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). Tr. 280-81. Dr. Drukteinis noted that the plaintiff's depressed mood is accompanied by physical complaints and fatigue.

David B. Lewis, D.O. reviewed the plaintiff's medical records, examined the plaintiff on April 10, 1991, and summarized his findings in a report dated April 11, 1991. Tr. 235-36.

---

[2]Somatization is the conversion of anxiety into physical symptoms. Stedman's Medical Dictionary 1434 (25th Ed. 1990).

5

According to Dr. Lewis, the plaintiff's plain lumbar x-rays from August 23, 1990, appeared normal except for slight decreased disc space at L5-S1, and a CT scan dated August 31, 1990, resembled a mild disc herniation at L5-S1 to the left. Tr. 235. Dr. Lewis diagnosed probable lumbar radiculopathy, bilateral piriformis syndrome, chronic pain, sleep disturbance and probable depression. Tr. 236. The plaintiff experienced "some good immediate effect" upon treatment with Marcaine and Celestone. Id. The plaintiff received prescriptions "for Prednisone at a decreasing dose, as well as Elavil to be used at night for sleep disturbance and pain." Id. An EMG test dated May 3, 1991, indicated improvement following the Marcaine and Celestone injections, and improved sleep from the Elavil. Tr. 239. The Prednisone provided no significant relief, although the physical therapy alleviated some leg symptoms. Id. Dr. Lewis found no evidence of significant neuropathic problems. Id. An addendum notes that an April 1991 MRI showed mild bulging "at L34 and L45," Tr. 238-39, which was later confirmed. Tr. 241.

Dr. Lewis indicated in a May 15, 1991, clinic note that the plaintiff still complained of back pain but it was less severe, with much less frequent RLE radiation. Additionally, the plaintiff was pleased with the physical therapy. An examination performed by Dr. Lewis on May 28, 1991, revealed spasm and

tenderness from the right lower thoracic and lumbar paraspinals. The plaintiff complained of back pain without radicular symptoms, and motor strength, reflexes, and lumbar mobility were unchanged. Tr. 241. In a clinic note dated June 11, 1991, Dr. Lewis observed that the plaintiff enjoyed significant improvement following manipulation, a decrease in low back pain and decreased RLE radiation. Tr. 242. In a June 27, 1991, clinic note Dr. Lewis reported continued intermittent RLE radiation occurring less frequently, and noted the plaintiff's commencement of a dynamic stabilization program and physical therapy. Tr. 243.

Dr. David J. Nagel examined the plaintiff and, in a report dated July 3, 1991, noted that while the cause of pain was not clear the condition correlated with either facet joint syndrome or an annular disc tear. Tr. 250-52. The plaintiff's prognosis was guarded, given the duration of his symptoms. Tr. 252.

The ALJ received additional medical evidence following the March 3, 1993, hearing. Dr. Nagel wrote in a March 15, 1993, report that the plaintiff had reached a point of maximum medical improvement. He also wrote that the plaintiff's attempts to return to work in 1992 resulted in a significant aggravation of low back pain which is treated with Iodine, an anti-flammatory prescription, as well as hydrocodone, a pain medication. Dr. Nagel stated that the plaintiff was not able to work. Tr. 285.

7

On July 1, 1993, OHA received a physical capacity evaluation ("PCE") which had been performed on July 3, 1991, by Ruth E. Kabel, an occupational therapist. Tr. 294-96. The PCE indicated a sedentary lifting capacity, but advised against any repetitive bending, lifting or twisting. Tr. 296.

Treatment notes dated June 2, 1993, indicate continued back pain, a change in medication and a referral to the Liberty Mutual Service Center in Boston, Massachusetts for vocational retraining, since Dr. Nagel did not believe the plaintiff could ever return to his past work as a draftsman. Tr. 318.

An IME completed by Dr. Richard Hockman on September 22, 1993, disclosed daily subjective pain in the plaintiff's low back, right leg and pelvis, Tr. 321, which increased with weather changes and varied from five to ten on a pain scale. The plaintiff reported that in the course of a month he generally would experience five days during which the pain would be severe enough to cause nausea. Id.

Dr. Hockman's physical examination revealed limited forward flexion, tenderness in the left sciatic notch and a decrease of sensory input in his right foot. Dr. Hockman wrote that the plaintiff had a chronic pain syndrome with no objective evidence for herniated disc or radiculopathy and that he is immobilized by pain. Tr. 322-23. Dr. Hockman considered it unlikely that the

8

plaintiff would be able to return to his work as an electrical design engineer because of his inability to sit for any length of time. Tr. 323. Dr. Hockman indicated that the plaintiff should undertake retraining to be a teacher of computer-aided drafting (CAD). Id. The doctor did not indicate that the plaintiff could return to work as a draftsman.

Dr. Thomas Pratt indicated in notes dated July 7, 1991, that the plaintiff complained of numbness in the right leg, aching in the low back, and stabbing pain in the mid back. The doctor noted that massage, manipulation, moist heat, and the use of a TENS unit were beneficial. Tr. 247-48. Dr. Lewis performed a physical examination on July 22, 1991, at which time the plaintiff complained of right-sided back pain and the doctor recommended continued physical therapy. Tr. 244.

On June 8, 1992, Dr. Nagel examined the plaintiff, noting complaints of an aching, stabbing sensation across the back with radiation up the back and down the right leg with occasional numbness in the right foot. Tr. 256-58. The plaintiff further reported that pain was aggravated by prolonged sitting and Elavil helped him sleep. The plaintiff was taking Xanax for situational depression. The doctor described the plaintiff's condition as chronic, mechanical low back pain, with an unclear cause. Conservative treatment having been maximized, the doctor

9

suggested a new MRI, treatment with Colchicine, or possibly a surgical procedure such as fusion.

Dr. James M. Shea recorded his diagnosis of the plaintiff's condition as a lumbar strain in an April 21, 1992, report. Tr. 260-62. The examination revealed some limitation of flexion and extension of the thoraco-lumbar spine, tenderness with percussion over the lower lumbar spine, and a sensory deficit to the level of the right knee.

Follow-up notes dated June 2, 1993, from Dr. Nagel disclose that the prescribed Lodine for inflammation upset the plaintiff's stomach, but the Vicodin was effective in alleviating pain. Tr. 315. Dr. Nagel noted that the plaintiff continued to be treated by a chiropractor, Dr. Bruck. Dr. Nagel diagnosed the plaintiff's condition as chronic low back pain. The doctor recommended continued Vicodin, participation in a swim program, and involvement with a program addressing vocational issues and perhaps rehabilitation.

Dr. Hockman reviewed the plaintiff's prior records and examined the plaintiff. Tr. 320-23. In an October 1, 1993, report the doctor indicated his diagnosis of the plaintiff's condition as chronic pain syndrome. Tr. 322. The doctor found no evidence of herniated disc or radiculopathy or that the right L-5 nerve root at the L4-5 interspace was deviated by any ex-

trinsic pressure.  The CT scan revealed no evidence of deviation or any bulging of the disc.  According to Dr. Hockman, the plaintiff had "no overt objective findings to confirm the presence of his significant impairment."  Tr. 323.

In a March 15, 1993, report Dr. Nagel noted that the plaintiff was treated with medication for inflammation.  Tr. 285.  Dr. Nagel noted on July 3, 1991, that the plaintiff's long commute, which necessarily involved prolonged sitting, prevented him from performing the drafting job.  Dr. Nagel suggested that the plaintiff could perform part-time work if allowed to change positions.  Tr. 252.

In an April 21, 1992, report Dr. James Shea disclosed similar findings of functional capacity.  Tr. 260-262.  The plaintiff could sit and stand, given an opportunity to change positions.  Walking was not limited, while lifting, carrying and bending were somewhat restricted.

In a June 8, 1992, report Dr. Nagel asserted that the plaintiff could perform activities of daily living including gardening and other household tasks, as long as such activities did not require prolonged lifting or bending.  Tr. 256.

In a March 15, 1993, letter Dr. Nagel indicated the possibility of sedentary work for the plaintiff, with a restriction to forty minutes of continued sitting.  Tr. 285.  In

11

an October 1, 1993, assessment, Dr. Hockman indicated the plaintiff's inability to sit for an extended period. Dr. Hockman suggested a job in which the plaintiff could stand, sit, and move around while working. Tr. 320-323.

In a July 3, 1991, assessment, Ruth E. Kabel, an occupational therapist, reported that the plaintiff could sit for forty minutes, stand for twenty minutes, and lift in the sedentary range. Tr. 294-296. She recommended the plaintiff avoid repetitive bending, lifting, or twisting, and be allowed to alternate standing and sitting.

An assessment prepared on May 1, 1992, by Dr. Burton A. Nault and affirmed on July 31, 1992, by Dr. A. Craig Campbell, Tr. 143-149, indicated the presence of chronic pain syndrome and possible radiculopathy, but not at listing-level severity. The assessment concluded that the plaintiff could perform light work, with no repetitive bending and lifting and that there was "no closed space of 12 months' total disability identified since his" alleged onset date. Tr. 149.

II. Procedural History

The plaintiff filed his current applications for a period of disability and disability insurance benefits on March 5, 1992, alleging an inability to work since August 21, 1990. Tr. 137-

12

140. The applications were denied initially and on reconsideration by the Social Security Administration. Tr. 141-151. An administrative law judge ("ALJ"), before whom the plaintiff and a vocational expert appeared, considered the matter de novo and, on September 1, 1993, issued a decision finding that the plaintiff was not under a disability. Tr. 16-23. The Appeals Council extended time to submit additional evidence. Tr. 7-8. On February 2, 1994, the Appeals Council denied the plaintiff's request for review, thereby rendering the administrative decision the final decision of the Secretary subject to judicial review. Tr. 4-5.

At the administrative hearing, the plaintiff testified as to his personal history, past relevant work experience, medical history, symptomatology, emotional condition and daily activities, and functional capabilities. Tr. 41-84. The plaintiff indicated that he suffered from severe "never-ending pain" in his back. He indicated that he took Vicodin, Lodine and Xanax on a regular basis for pain and that these medications made him tired. He testified that he is able to drive, walk short distances, assist with household chores such as cutting grass and driving a tractor as well as perform a part-time job to the satisfaction of his employer. Tr. 63-90. The plaintiff also testified that he reads, watches television, and gardens for up to one hour, and

13

that he can lift and carry approximately eight pounds.  Id.  The plaintiff noted that he suffers from depression as a result of his injury.  Id.

The vocational expert ("VE"), Karla Forgiel, M.S., a certified specialist in rehabilitation counselling, testified that the past work of drafter constituted sedentary, skilled work and that the past work of construction equipment operator consisted of medium, skilled work.  Tr. 91-92;  See 20 C.F.R. §§ 404.1567 and 404.1568.

The ALJ posed several hypotheticals to the VE, presupposing an individual with the same age, training, education, and work experience as the plaintiff.  In the first hypothetical, the individual is limited to sedentary work, can sit for forty minutes, drive for one hour, stand for twenty minutes, lift five pounds from the floor and ten pounds from the waist, is restricted from repetitive bending, lifting, and twisting, and must frequently change position.  Tr. 92.  The VE testified that such a person could return to the work of a drafter.  Tr. 93.

In the second hypothetical, the individual has a residual functional capacity ("RFC") for light work and is restricted from lifting or carrying more than thirty pounds.  The VE stated that such a person could work as a drafter but not as an equipment operator.

14

The third hypothetical presupposes an RFC for sedentary work, lifting no more than ten pounds. In the VE's opinion this individual could work as a drafter. Tr. 94.

The fourth hypothetical presupposes the conditions set out in the first, but adds a depressive syndrome resulting in a low degree of concentration. According to the VE, such an individual would be unable to work as a drafter, but could perform the unskilled, sedentary work of a security guard, cashier, or information clerk. Tr. 94-95.

The last hypothetical considers an RFC for sedentary work, carrying or lifting ten to fifteen pounds, with standing and sitting restrictions. The VE opined that such an individual could not perform any of the skilled sedentary jobs but could perform the unskilled sedentary jobs previously described. Tr. 96.

The ALJ applied the five-step sequential process applicable to a claimant's disability application. 20 C.F.R. § 404.1520 (1992); see, e.g., Ortiz v. Secretary of Health and Human Servs., 890 F.2d 520, 522 (1st Cir. 1989).[3] The ALJ found that (1) the

---

[3]Pursuant to 20 C.F.R. § 404.1520 (1992), the following five steps must be considered when evaluating whether a claimant is disabled:
    (1) whether claimant presently is engaged in substantial gainful activity;
    (2) whether claimant has a severe impairment;
    (3) whether the impairment meets or equals a listed

15

plaintiff has not engaged in substantial gainful activity since August 21, 1990; (2) the medical evidence establishes that the plaintiff has severe low back pain; (3) the plaintiff does not suffer from any impairment, either singly or in combination, listed in or medically equivalent to one listed in Appendix 1, Subpart P, Regulations No. 4; and (4) the plaintiff's impairment does not prevent him from performing his past relevant work. Tr. 21-22. The ALJ found that the plaintiff's allegations regarding his pain and functional limitations were not fully credible and that he retained the functional capacity to perform work related activities except for work involving lifting over ten pounds and prolonged periods of sitting, standing and walking without changing positions as necessary. Tr. 22; see 20 C.F.R. § 404.1545. Accordingly, the ALJ determined that the claimant was not under a disability as defined in the Social Security Act and denied the plaintiff benefits.

In support of his motion to reverse, the plaintiff argues, inter alia, that the ALJ's step-four determination was incomplete and therefore lacking in substantial evidence. Specifically, the

impairment;
    (4) whether the impairment prevents claimant from performing past relevant work;
    (5) whether the impairment prevents claimant from doing any other work.

16

plaintiff contends the ALJ failed to properly consider his depression; significant evidence of pain; and frequent use of medications. The plaintiff further asserts that the ALJ failed to properly evaluate his statements as to his ability to perform past relevant work and that the ALJ failed to make appropriate comment on the medical evidence regarding such capability.

## Discussion

Pursuant to 42 U.S.C.A. § 405(g), the court is empowered to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In reviewing a Social Security disability decision, the factual findings of the Secretary "shall be conclusive if supported by `substantial evidence.'" Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

The court "`must uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Secretary's] con-clusion.'" Irlanda Ortiz v. Secretary of Health and Human

17

<u>Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (quoting <u>Rodriguez v. Secretary of Health and Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)); <u>accord</u> <u>Richardson</u>, 402 U.S. at 401. Moreover, "[i]t is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the Secretary, not the courts." <u>Irlanda Ortiz</u>, 955 F.2d at 769 (citing <u>Rodriguez</u>, 647 F.2d at 222); <u>see</u> <u>also</u> <u>Burgos Lopez v. Secretary of Health and Human Servs.</u>, 747 F.2d 37, 40 (1st Cir. 1984).

## I. Step Four Determinations

In Step Four, the ALJ must determine whether the claimant's impairment prevents him from performing past relevant work. 20 C.F.R. § 404.1520(4) (1992).

The burden is on the claimant to show impairments preventing him from returning to past relevant work. <u>Gray v. Heckler</u>, 760 F.2d 369, 371, 372 (1st Cir. 1985).

> [T]he claimant has the burden of making some reasonable threshold showing that [he] cannot return to [his] former employment because of [his] alleged disability. To do so, claimant must initially produce relevant evidence of the physical and mental demands of [his] prior work. . . . The claimant must then describe those impairments or limitations which [he] <u>says</u> [he] has, so as to "raise the point to the Secretary" how current functional capacity . . . precludes the performance of the particular prior job.

18

Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir. 1991) (emphasis in original) (citations omitted). "In short, not only must the claimant lay the foundation as to what activities [his] former work entailed, but [he] must point out (unless obvious) -- so as to put in issue -- how [his] functional incapacity renders [him] unable to perform [his] former usual work." Id. After the claimant meets his burden, the Secretary must ascertain the demands of the claimant's former work and compare them to the claimant's abilities. Id.

In determining whether a claimant has the residual functional capacity to perform his past relevant work, the ALJ must evaluate the claimant's functional limitations and compare them to the demands of those jobs the claimant has performed in the past. See Social Security Regulation ("SSR") 82-62, 1982 WL 31386 at *2. The concept of past relevant work includes not only the actual functional demands and duties of a particular past relevant job but also the functional demands and job duties of the occupation as generally required by employers in the national economy. Rivera v. Sullivan, 771 F. Supp. 1339, 1352 (S.D.N.Y. 1991); SSR 82-62, 1982 WL 31386 at *3; SSR 82-61, 1982 WL 31387 at *2.

In Curtis v. Sullivan, 808 F. Supp. 917 (D.N.H. 1992), the court stated,

19

> Determination of the claimant's ability to do
> [past relevant work] requires a <u>careful appraisal</u>
> of (1) the individual's statements as to which
> past work requirements can no longer be met and
> the reason(s) for his or her inability to meet
> those requirements; (2) medical evidence estab-
> lishing how the impairment limits ability to meet
> the physical and mental requirements of the work;
> and (3) in some cases, supplementary or corrobor-
> ative information from other sources such as
> employers, the Dictionary of Occupational Titles,
> etc., on the requirements of the work as generally
> performed in the economy.

SSR 82-62, 1982 WL 31386 at *3). Social Security Ruling 82-62 lists factors which must be developed to document adequately past work, including job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, extent of supervision and independent judgment required, and a description of tasks and responsibilities. <u>Id.</u> Finally, SSR 82-62 cautions that rulings on disability must be clear and the determination must contain among the findings specific findings of fact as to the individual's RFC, the physical and mental demands of the past job/occupation, and a specific finding that the individual's RFC would permit a return to his or her past job or occupation. <u>Id.</u> at *4; <u>see also</u> <u>Nolen v. Sullivan</u>, 939 F.2d 516, 518-19 (7th Cir. 1991); <u>Kirby [v. Sullivan]</u>, 923 F.2d [1323,] 1326 [(8th Cir. 1991)].

<u>Curtis</u>, 808 F. Supp. at 923 (emphasis added).


## II.  The Plaintiff's Depression

The psychological back profile performed by Dr. Drukteinis constitutes significant medical evidence of the plaintiff's depression. <u>See</u> Tr. 275, 276, 279, 281. Further, Vocational Expert Forgiel testified the plaintiff could not perform "any of his past relevant jobs of drafting" assuming "low degrees of

20

concentration" due to a depression syndrome.  Tr. 94.  In his decision the ALJ raised the issue of depression by stating that the plaintiff "takes Xanax for depression, which is apparently situational related to his condition."  Tr. 20.  However, the ALJ failed to elaborate on the relationship between such depression and the plaintiff's ability to perform past relevant work.  See Tr. 16-22.  Such an omission demonstrates a failure to undertake the necessary "careful appraisal" of the medical evidence required under Curtis.  See 808 F. Supp. at 923.  Accordingly, the court finds the ALJ's decision to be lacking in substantial evidence.  The court reverses the Secretary's decision and remands the case for appropriate consideration of the plaintiff's depression.

Because the case is remanded for further consideration by the ALJ, the court need not consider the merits of the remaining arguments advanced by the plaintiff.


## Conclusion

The record supporting the decision of the Secretary denying the plaintiff's request for benefits is lacking in substantial evidence.  The plaintiff's motion to reverse and remand (document

21

no. 10) is granted.  The defendant's motion to affirm (document no. 7) is denied.  The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

March 27, 1995

cc:  Raymond W. Kelly, Esquire
     David L. Broderick, Esquire

22