NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 13, 2007
Decided December 17, 2007

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 07-1329

| | |
|---|---|
| DIANE M. COHEN,<br>    *Plaintiff-Appellant,*<br><br>    *v.*<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br>    *Defendant-Appellee.* | Appeal from the United States District<br>Court for the Northern District of<br>Illinois, Eastern Division<br><br>No. 05 C 6021<br><br>Elaine E. Bucklo,<br>*Judge.* |

**O R D E R**

Diane Cohen last worked in 1989 when she was 37 years old. She left her office job while pregnant, and elected not to return to the workforce after her daughter was born in June 1989.[1] As a consequence of staying at home, her insured status for Social Security disability purposes expired on December 31, 1991. By then Cohen had been diagnosed with multiple sclerosis (MS) and migraine headaches, but not until March 2003 did she apply for disability benefits (alleging

---

[1]Cohen testified both that her employer was "cutting back" and that she left the workforce to care for her daughter.

onset in 1989). Her claim was denied, and Cohen requested a hearing before an ALJ. The ALJ agreed with Cohen that by the time her insured status had ended she was suffering from severe impairments and also was no longer gainfully employed. But although MS (on which the parties focus) is a "listed impairment" that compels a finding of disability if severe enough, the ALJ concluded that Cohen's MS had never reached the point of meeting or equaling the MS listing or any other listing. The ALJ reasoned Cohen was eligible for benefits only if, by the time her insured status ended, her MS had progressed to the point that she no longer could return to work. The ALJ concluded that it had not. In this appeal Cohen frames several issues, but essentially she contends that the ALJ should have found that her MS had progressed to the point of meeting the MS listing, or at least would have kept her from returning to work, before her insured status ended. The ALJ's finding is supported by substantial evidence. We therefore uphold the denial of benefits.

## Background

Except as noted, the following account is taken from contemporaneous medical records and the reports of all physicians prepared in connection with Cohen's application for benefits. It is undisputed that Cohen had MS at the time of her alleged onset of disability in June 1989. The previous month her dentist had referred her to a Chicago-area neurologist after x-rays ruled out a dental abnormality as the source of her complaints of toothaches and numbness in her face. Although the neurologist's report is not included in the record, it appears that he ordered an MRI resulting in the diagnosis of Cohen's condition as MS.

Dr. Donald Goodkin confirmed this diagnosis in July 1989 after Cohen sought a second opinion from him while visiting family in Cleveland, Ohio. Goodkin noted that Cohen was "alert, oriented and conversant," had 20/25 vision, showed no evidence of drift or focal weakness and displayed normal sensation and reflexes in her arms. Goodkin noted that "point-to-point testing," which he did not explain, was normal except for a "superimposed posterior tremor" that did "not produce functional impairment." He did find that "rapid alternating rhythmical movements show a very minimal suggestion of impairment in the right hand," but noted that Cohen was "not aware of this." Goodkin reported "brisk" reflexes in Cohen's knees and normal sensation in her legs, and he saw no obvious impairment while observing her gait and conducting heel-to-shin testing. Goodkin described Cohen's general appearance as "healthy," and noted that, although she complained of stiffness in her leg while standing up, she reported that the headaches that plagued her in the past were no longer a problem.

Cohen returned to Illinois and in December 1989 was treated at the neurology department of Loyola University Medical Center in Maywood, Illinois. At

that time Cohen reported that she felt very tired, was suffering from ringing in her left ear, had diminished vision, and was tripping over her tongue. The neurologist's records show that Cohen had a steady gait, good muscle strength (4 on a scale out of 5) in her right biceps, and normal muscle strength (5 of 5) in her left biceps, right and left triceps, and legs. Cohen reported decreased sensation on the right side of her face and her right leg, and the neurologist noted that although Cohen presented some symptoms of MS she did not display acute exacerbations of these symptoms.

After December 1989, as far as the administrative record reflects, Cohen waited another year before seeking further treatment related to motor function as a result of MS. She did see an ophthalmologist in April 1990 and reported difficulty reading and occasional spots of haze. The ophthalmologist suspected Cohen was suffering from MS retinopathy, but further tests indicated her vision was within normal limits.

Then in December 1990, Cohen began seeing Dr. Floyd Davis, a neurologist at the Rush-Presbyterian-St. Luke's Medical Center and she told Davis that she was "doing very well" and was "ok now" except for fatigue, occasional tingling of the right hand and foot, blurred vision, and headaches. Davis referred her to occupational therapist Lindsay Barnes. Cohen likewise told Barnes that her symptoms included fatigue and headaches. Cohen reported to Barnes that she was responsible for homemaking and childcare, and that she functioned independently in all self-care and homemaking tasks.

Cohen next saw Dr. Davis in July 1991, just six months before her insured status expired. Davis, in his records, described Cohen as "doing good." He noted that her vision was okay and she was getting fewer headaches, on average one a week, but that she would have to go to sleep if it was severe, and that she was always tired. Davis prescribed medication for the headaches and referred Cohen to Dr. Kenneth Moore to advise her on headache management. On the same day, Cohen completed an MS questionnaire, on which she described her ability to walk as "functional" and reported she could stand, get in and out of bed or the bath, and roll from side to side in bed without difficulty.

Cohen followed up with Dr. Moore for headache treatment in September 1991. She told him that she had been having severe headaches for 10 years and had a family history of headaches. She reported that over the years she sometimes had headaches five to six times a week and that most were "moderate," and while painful they did not prevent her from continuing normal activities. Sometimes, however, she was absent from work or stopped doing household chores because of the pain. Cohen saw Moore again in October and November 1991, and said in November that she was "doing pretty good" and that the medication he prescribed for her migraines "works most of the time but not always."

Cohen's insured status expired on December 31, 1991. During the following year she saw Dr. Davis and Dr. Moore on just one occasion each. She told Moore in February 1992 that she had not had a severe headache for several weeks and was not experiencing side effects due to her medication, and she told Davis in August 1992 that her MS was "fine."

After Dr. Moore moved his practice to Michigan, Cohen began seeing Dr. Hans Evers, a headache specialist. During her first visit in May 1993, Evers noted that Cohen was experiencing both migraines, which she started having at age 18, and tension headaches. Evers reviewed Cohen's headache medications and made adjustments.

Cohen continued to see Dr. Davis and Dr. Evers. In August 1993 she told Davis that she had not suffered a headache for three months. She told Evers in October 1993 that currently she was not experiencing any severe migraines, and only a few moderate migraines and occasional tension headaches.

Dr. Evers left private practice in 1994, and Evers referred Cohen to Dr. Lawrence Robbins, another headache specialist. Before Robbins examined her for the first time in December 1994, Cohen completed an intake questionnaire on which she noted that only three or four times per month did she experience a moderate to severe headache that required medication or sleep. After that visit Cohen saw Robbins or consulted with him by telephone several dozen times over the next nine years. During that time Robbins varied Cohen's prescriptions for headaches, which worsened in the mid-1990s. Cohen had headaches daily in February and March 1995, and in May she described her headaches as "terrible." In June 1996 she told Dr. Robbins that she was "getting a lot more headaches." And in October 1999 Cohen complained about a severe headache that lasted three to five days.

Cohen also continued to see her neurologist, Dr. Davis, about once annually through 1999. Davis's treatment notes are sparse and nearly illegible, but it appears that in 1993 and 1994 he described Cohen's condition as stable. In March 1994 Cohen reported a problem with the feeling in her foot, and Davis prescribed prednisone. At her next visit in August, Cohen said that the prednisone had "really helped." A year later, the problem with her foot had decreased. Davis noted Cohen's gait was normal during each visit between 1994 and 1998.

When Davis was nearing retirement in 2000 or 2001, he referred Cohen to Dr. George Katsamakis for a neurologic evaluation. During the first consultation in April 2001, Cohen reported a constant baseline fatigue, with some days better than others, and headaches three to four times per week. Twenty months later, though, when Katsamakis compared the results of the MRI from 1989 with one taken in

December 2002, and he concluded that there had been little change overall in the progression of the MS. When Katsamakis reviewed his conclusions with Cohen in late January 2003, she noted that she was very tired, that she still always had a baseline fatigue, and that occasionally she suffered bouts of severe fatigue. Katsamakis noted that Cohen was clinically stable but very tired, and decided to continue her current medication, subject to further review in six to twelve months.

Meanwhile, Cohen had retained counsel a few weeks before her January 2003 meeting with Dr. Katsamakis, and three weeks after that meeting, on February 11, Katsamakis completed a questionnaire about Cohen's condition. On the questionnaire Katsamakis reported that Cohen was experiencing symptoms of MS including headaches, fatigue, and ringing in her ears. Katsamakis also stated that she was experiencing "headaches, daily, more severe migraines 3x/week" and "sensation to pin/position throughout." Cohen's symptoms, he said, frequently interfered with the attention and concentration needed for simple tasks, and he opined that she would be capable of performing only low-stress jobs. He also concluded that Cohen must have the freedom to shift positions at will during the work day, that she would require breaks of unpredictable length at unpredictable intervals, and that she was incapable of carrying ten pounds, could rarely climb steps or ladders, and would be absent from work more than four days per month. Katsamakis suggested the earliest date her limitations began was possibly more than six years earlier. But he was not asked to, and did not, compare Cohen's condition at the time of this survey with her condition before the end of 1991.

Cohen filed an application for disability benefits in late March 2003. She identified her disability as fatigue caused by MS and migraines and alleged a disability onset date of June 27, 1989, the day her daughter was born. In her application Cohen gave her pregnancy as the reason she had stopped working before that date.

In April 2003, Dr. Katsamakis completed a neurological report for the Bureau of Disability Determination Services. He noted that Cohen had MS with decreased sensation to pinprick in her legs, full muscle strength in her arms and legs that decreased to poor muscle strength with sustained or repetitive activity, normal finger-to-nose and heel-to-shin testing, a normal ability to walk, and no manipulative limitations. Katsamakis was unable to determine if there had been any change in Cohen's tolerance for sustained or repetitive activity. Katsamakis next saw Cohen in July 2003, and at that time he noted in his records that her MS was stable and that her main problem was fatigue.

Cohen's application was denied in July 2003. The agency determined that she did have some limitations but was not disabled as of her date last insured and

was capable of returning to her previous work as a personnel recruiter. Cohen asked for reconsideration, but submitted no additional evidence.

Dr. Virgilio Pilapil, a state-agency physician, reviewed the medical record in September 2003 and opined that before December 1991 Cohen could carry 20 pounds occasionally and 10 pounds frequently, and could stand or walk 6 hours of each workday with a "handheld assistive device." He also found that before December 1991 Cohen occasionally could climb and frequently could balance, stoop, kneel, crouch, and crawl. Dr. Robert Patey, another state-agency physician, also reviewed the medical record and concurred in Pilapil's assessment. Cohen's application was denied again on reconsideration, and in October 2003 Cohen requested a de novo hearing before an ALJ.

A hearing was held before an ALJ in November 2004. Cohen and her husband testified at the hearing, but no medical or vocational experts were present. At the hearing Cohen testified that she had last worked as a recruiter. She was mostly seated while performing this job, which involved very little lifting. Before that she had worked as a secretary at Hertz car rental and as a real estate agent; at Hertz she also remained seated for about six hours a day and at both jobs lifted nothing heavier than office supplies. She did testify that she suffered headaches two or three times a week while working at Hertz. Sometimes she would turn off the lights in her office when she had a headache, sometimes she would go home of her own initiative, and once or twice a month when she was in pain her boss would send her home.

Cohen said that she left her job as a recruiter because her employer was cutting back at that time, and also because she wanted to stay home after the birth of her daughter. She then drew unemployment benefits until they were exhausted. Cohen did not say there were medical reasons other than her pregnancy that prompted her departure.

The ALJ agreed to hold the record open so that Cohen could introduce additional evidence. In January 2005, Dr. Julian Freeman, a neurologist, reviewed the medical records at the request of Cohen's counsel and concluded that she was disabled as defined in the regulations at least as of 2003, and that her MS had changed little in severity between 1989 and 2003. Freeman thus opined that there was an 80% probability that she was disabled before 1992 as well.

Dr. Katsamakis also wrote a letter in January 2005 (it is unclear to whom) suggesting that from 1989 to 1991 Cohen suffered from symptoms including migraine headaches, fatigue, sensory disturbances, and blurred vision "which disabled her then as they do now." He also completed a residual functional capacity questionnaire about Cohen's headaches. Katsamakis observed that Cohen's

headaches were severe, occurred 5 to 6 times each week for 12 to 24 hours each, and sometimes were accompanied by nausea or vomiting, sensitivity to light, and visual disturbances. He stressed that because of these headaches Cohen would need to take an unpredictable number of unscheduled breaks that could each last "perhaps hours!" Katsamakis now concluded, in contrast to the opinion he rendered in February 2003, that Cohen was incapable of working even low-stress jobs.

The ALJ issued his decision in May 2005. He performed the five-step evaluation required by 20 C.F.R. § 404.1520: At Step 1, the ALJ found that Cohen was not performing substantial gainful activity, and at Step 2 he found that Cohen's MS and migraines qualified as a severe impairment. At Step 3, however, the ALJ concluded that before the expiration of Cohen's insured status those impairments did not meet or medically equal any listed impairment, including the listing for MS, Listing 11.09. According to the relevant part of that listing, MS is not automatically disabling unless there is evidence of "[s]ignificant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurologic dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.09(C). Therefore, the ALJ was required to make a determination of Cohen's residual functional capacity (RFC). 20 C.F.R § 404.1520(e). The ALJ found that Cohen had not established functional limitations that precluded all work as of December 31, 1991, her date last insured (DLI). In making this determination, the ALJ discredited Cohen's testimony as inconsistent with the medical records, and accorded minimal weight to the opinions of Dr. Katsamakis and Dr. Freeman. The ALJ found Katsamakis's opinion troublesome because he apparently did not take over care of Cohen from Dr. Davis, his former colleague, until 2001 at the earliest. Additionally, the ALJ concluded that Katsamakis's opinion about the severity of Cohen's condition at the time of her date last insured (DLI) was inconsistent with the medical records from both before and after the DLI. Finally, at Step 4 the ALJ found that, considering Cohen's RFC, she could have returned to her past relevant work as a real estate agent, secretary, or recruiter as of the DLI, and therefore was not under a disability at that time.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner, 20 C.F.R. § 404.981; *Scott v. Barnhart*, 297 F.3d 589, 593 n.4 (7th Cir. 2002). Cohen timely sought judicial review of the agency decision, *see* 42 U.S.C. § 405(g), and the parties cross-filed motions for summary judgment, which the district court granted to the Commissioner in November 2006.

**Analysis**

We review de novo the district court's grant of summary judgment, *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007), and review the final decision of the Commissioner for substantial evidence. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Substantial evidence may be less than a preponderance of the evidence, but requires the ALJ to identify supporting evidence in the record and build a logical bridge from that evidence to the conclusion. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). We will not reconsider facts or make credibility determinations. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

Before turning to the central issue, three other tangential points raised by Cohen can be quickly addressed. First, the underlying theme of Cohen's brief is the severity of her headaches. But headaches are relevant only if they result from MS (they can be a symptom of MS[2]) and cause "significant, reproducible fatigue of motor function," *see* 20 C.F.R. Pt. 404, Subpt. B., App. 1, Listing 11.09(C), or if they are themselves an impairment that might be disabling. But Cohen has never tried to establish a causal connection between her headaches and her motor function, and the evidence does not suggest any change in the severity of her headaches—which she had been suffering since age 18, her entire working life—at the time she left the workforce. Thus, the headaches are largely irrelevant to the determination of disability.

Second, Cohen argues that the ALJ erroneously discredited her hearing testimony. The reason given—that her hearing testimony contradicted her contemporaneous reports to physicians and their independent observations—is a legitimate basis for affording little weight to her testimony. *Schmidt v. Astrue*, 496 F.3d 833, 843-44 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 334-35 (7th Cir. 1994).

Third, Cohen faults the ALJ for failing to identify by name the specific disability listing he is analyzing in his written decision. But the ALJ's decision makes clear that he is referring to Listing 11.09, and Dr. Freeman refers to Listing 11.09(C) by name in a letter submitted to the ALJ before the ALJ rendered his decision, so there is no question everyone understood that listing was the one relevant to the adjudication.

The only serious question in this case, then, is whether the ALJ relied upon substantial evidence to adopt the medical opinions of the state-agency physicians rather than those of Dr. Katsamakis and Dr. Freeman. Cohen argues that the ALJ erred in discounting the weight of Katsamakis's and Freeman's medical opinions and that as a result the ALJ erred at Step 3 (determining that Cohen's MS did not

---

[2]ABOUT MS: SYMPTOMS (2007), http://www.nationalmssociety.org/site/ PageServer?pagename=HOM_ABOUT_symptoms.

meet or medically equal a Listing 11.09(C) as of her DLI) and Step 4 (that as of her DLI her MS did not prevent her from returning to her previous work).

Cohen initially suggests that the ALJ's choice between the medical opinions is not adequately explained. We disagree. The ALJ discredited the opinions of Dr. Katsamakis and Dr. Freeman because he found they were inconsistent with the treatment records from the relevant time period and other evidence. The ALJ noted that Katsamakis's opinion, in particular, was inconsistent with treatment notes made by Dr. Davis, and that the letter Katsamakis wrote was suggestive of a much longer treatment relationship with Cohen than was the actual case. The ALJ specifically adopted the opinions of the state-agency physicians because they were "consistent with the objective evidence through at least the date last insured, including information provided by claimant in response to a questionnaire on July 29, 1991."

Cohen also argues that, even if the ALJ's decision is adequately explained, it still must be set aside because Dr. Katsamakis was a treating physician, and so his opinion was entitled to great, if not controlling, weight as a matter of law. But Katsamakis was not one of Cohen's treating physicians until at least a decade after her DLI. Cohen cites *Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006), for the proposition that opinions of physicians who do not begin treating a patient until after the patient's DLI are entitled to the same weight of as those of physicians who provide treatment prior to the DLI. But *Allord* says nothing of the sort. In that case, we held that the ALJ erred by ascribing too much weight to medical evidence from more than five years before the DLI. But that was because there was also contradictory evidence given by a specialist just four months after the DLI at a time when the medical community better understood the claimant's condition. *See Allord*, 455 F.3d at 819-20, 822. Here, Katsamakis's opinion was further removed from the DLI rather than closer to it and Cohen does not argue there have been any relevant intervening advances in neurology. *Allord* also says that a retrospective diagnosis usually requires corroboration contemporaneous with the DLI. *See Allord*, 455 F.3d at 822.

Cohen concedes that there is no medical opinion prior to her DLI that she met a listed impairment. And there is nothing in the record, medical or otherwise, that suggests any muscle fatigue of the kind necessary for a finding of disability under Listing 11.09(C) prior to that date. *See Allord*, 455 F.3d at 822; *Wilder v. Apfel*, 153 F.3d 799, 802 (7th Cir. 1998) (holding that corroborating evidence need not be medical). Indeed, Cohen had normal strength in her legs and in three of the four major muscles in her arms and good strength in the remaining one as of December 1989. As late as July 1991, Cohen had reported no difficulty in walking or standing, in getting in and out of bed or the shower or bathtub, standing up, or rolling from side to side in bed. It was not until 2003, a dozen years after Cohen's

insured status had expired, that Katsamakis first reported Cohen was experiencing significant muscle fatigue after sustained or repetitive activity. All of the medical evidence contemporaneous with the DLI supports the ALJ's conclusion, and even if this court accepts the retrospective medical opinions as significant, they do not undercut the contemporaneous evidence upon which the ALJ based his decision.

Moreover, there is nothing in the record to suggest that MS is the type of condition that follows a well-known progression so that a date of disability can be inferred after the fact without contemporaneous corroboration. *See Allord*, 453 F.3d at 822. Indeed, Katsamakis noted in his letter that "the unpredictable course of MS leads to fluxuations in the severity of these symptoms."

And even if Katsamakis is considered a treating physician, his opinion would still not be entitled to great or controlling weight because it is inconsistent with the other substantial medical evidence, particularly the evidence produced near the DLI by Dr. Goodkin, Dr. Davis, and Dr. Moore, all themselves treating physicians. *See Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). Weighing conflicting medical evidence is the province of the ALJ, and there is substantial evidence to support his determinations at Steps 3 and 4. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

Cohen's fall-back position here is that the ALJ's Step 4 determination was independently erroneous because this court's decision in *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991), requires the ALJ to spell out in detail the demands of each prior job to which the ALJ finds the applicant able to return, and the ALJ failed to do this. But this court has construed *Nolen* more narrowly, holding that an ALJ cannot describe a previous job in a generic way, e.g., "sedentary," and on that basis conclude that the claimant is fit to perform all sedentary jobs without inquiring into any differences in what the job requires while sitting. *Smith v. Barnhart*, 388 F.3d 251, 252-53 (7th Cir. 2004). Here, the ALJ considered the specific jobs Cohen held, so *Nolen* is inapplicable. Moreover, the evidence in the record showed Cohen's previous jobs included up to seven hours a day sitting and no lifting of more than ten pounds (generally of office supplies), and the medical evidence concerning the relevant time period showed no inability to perform these tasks. Thus, there is ample support for the ALJ's conclusion that as of Cohen's DLI she could have returned to any of these jobs.

AFFIRMED.